HELEN O'KEEFE V. THE STATE.

No. 22217.   Delivered December 16, 1942.
Rehearing Denied February 3, 1943.

The opinion states the case.

*Croom & Croom,* of Houston, for appellant.

*Dan W. Jackson,* Criminal District Attorney, and *A. C. Winborn, A. H. Krichamer,* and *O'Brien Stevens,* Assistant Criminal District Attorneys, all of Houston, and *Spurgeon E. Bell,* State's Attorney, of Austin, for the State.

BEAUCHAMP, Judge.

Helen O'Keefe was convicted of the murder of J. C. Franklin and assessed a penalty of twenty-five years imprisonment in the State penitentiary by a jury in Harris County and she brings this appeal.

The indictment alleges that on about the 12th day of November, 1941, appellant killed J. C. Franklin by shooting him with a gun. Another count alleges that he was killed by means unknown to the grand jurors.

The State's case and the constituent elements necessary to establish the offense charged are supported only by circumstantial evidence. Appellant is a young woman who had been employed by a loan company, of which Franklin was manager, for a period of eleven years. She is shown to have been a trusted employee of the company. In his absence she had charge of the business and assisted in its conduct even while he was present. There is no evidence of any disagreement between them at any time and no circumstance which would indicate that he was dissatisfied with her or that the relationship as employer and employee was any different from what it had been for several years past. The business was incorporated some twenty years ago and had a paid up capital stock of $90,000.00. At the time of the alleged tragedy the assets consisted solely of notes to the amount of $19,000.00, with a liability of $5,000.00 for borrowed money from the bank. Several audits of the business had been made in past years which seem to have been unsatisfactory to Franklin and no details of them are in the record. It appears that another audit was being considered which was not completed at the time of the trial and the voluminous record in the case gives few details of the business other than that above stated.

For some weeks prior to November 12, appellant had sought at different times to engage the services of certain characters to beat Franklin up, break his legs or do something that would put him in the hospital for several months. This evidence is given in the record in great detail, some of which is corroborated by

evidence which seems to be reliable. To some of these men she made the statement that it would do Franklin an extremely great favor. Again she cautioned that she didn't want him killed, she only wanted him put in the hospital. This evidence was introduced as part of the State's case and came from the men so approached. One of these men sold her a pistol, which will be hereinafter considered, but we find no evidence of any threat on her part to use it on Franklin and there is no indication that she did. She gave other reasons for wanting to buy it.

For several months prior to November 12, appellant had been keeping company with Louis Rabouin, an ex-soldier, who was about nineteen years of age. He had an automobile and she was with him or had his car very nearly every day. He testified as a witness in the case but does not seem to have assisted in her plan to have the injury inflicted on Franklin.

It is the theory of the State that appellant murdered Franklin under the circumstances given and that her motive in doing so was to hide a shortage which she had created in the business by forging checks on company funds and securing the money for herself. At least we find no other motive indicated by the State's evidence or its brief. There is no evidence offered by the State, however, to show that she expected to come in charge of the business; that Franklin had ever complained to her about the forgeries; that he knew of what had taken place or that any record had been made which could not be discovered by other interested directors or stockholders as well as by Franklin. That the removal of Franklin from his business would help appellant hide her unlawful transactions with the company funds is not supported by the evidence.

A brief summary of the very lengthy statement of facts will include only that which is pertinent to the issues necessary to a discussion of the law involved. On November 11, appellant and her young friend, Rabouin, had spent the holiday together driving out into the country, at which time they found themselves on what appears to be an old boat landing on the San Jacinto River about eighteen miles from the heart of the city, a spot which appears to be semi-secluded. Occasional landings were made from the river and witness and appellant reached it by a worn out roadway which at one time was probably used by heavy traffic. At this point their car became stalled in the sand and they spent several hours extricating it. During the time, they practiced shooting with the pistol which she had purchased. Early the next morning, according to the statement made by her to his family, she met Franklin, at his suggestion,

soon after he left his home for the office and drove him into Hermann Park where they consulted for a short time about a trip he said he was taking that day to Austin. The length of this stay together was indefinite and the purpose is not explained. She never reported to the office during the day, leaving it with a young girl who was inexperienced and had not been given any responsibilities in the daily affairs of the office. At about 4:30 in the afternoon, a man in a boat came to the landing place which had been visited on the previous day by appelland and her companion and found a car burning there. He concluded that a human body was in the burning car and reported it to the officers, a number of whom testified as witnesses in the case. The car proved to be a coupe belonging to Franklin and the one in which he left his home to go to his work that morning. A small portion of a human body, variously estimated to weigh between fifteen and twenty pounds, was found in the car and the State seeks to prove that it was the remains of J. C. Franklin. Much of the evidence in the case centers about the issue, which is a necessary fact to be proved before the jury would be authorized to return their verdict of guilty. It will be necessary further for the State to show that Franklin met his death by the criminal act of another; that appellant was present and assisted in the act or that she was performing some part in connection with it in a manner that would make her a principal in the crime.

On the question of identity, it may be admitted that the car belonged to Franklin and was the one used by him on that date. Among its ruins was found a portion of a human body insufficient to be identified as his except by the circumstances which surrounded it when a search of the ruins had been completed. A watch was found identified as his, keys and a keyholder with his name on it, a carpenter's rule, a Catholic tag, two Catholic medals, spectacles, a pin, a buckle, a knife and cuff buttons, all identified as being his property. A piece of burned brown cloth was believed to be a part of his suit. A piece of a shoe was of the same style and fashion as a pair sold to him. One natural and seventeen false teeth were found, concerning which the testimony, much controverted, nevertheless indicates that they could have been the teeth of Franklin, though nine false teeth and one natural tooth were entirely missing. It can hardly be said in the state of the evidence that the dentist who made them positively identified them as the teeth of Franklin. They could have been his teeth. Of the human flesh found, there was a much burned small portion of a lung and a very small part of the flesh about the bones of the pelvis, including a protected portion of the lower bowels, a piece of a skull approximately

the size of the palm of one's hand, some small pieces of bone and the pelvis protected by the flesh, together with a small portion of the large bone in the upper part of each leg. All the rest of the bones were missing. The evidence shows it was a portion of a male person of approximately the age and size of Franklin. An X-ray specialist who had made a picture of the pelvis bone of Franklin in June, 1941, examined the remains after they were exhumed some time after the death and took another picture at about the same distance and angle from the pelvis as that taken of Franklin in his lifetime. After describing the two pictures and pointing out their similarity in size and shape, he gave his opinion that they were identical.

The defense takes the position that it was not the body of Franklin, that he is not dead and that the whole transaction was a frame-up to aid in the escape of Franklin and for the collection of an insurance policy made payable to his company in the amount of $35,000.00 on his life, with $25,000.00 additional for accidental death. They produced a witness, R. C. Maxwell, who qualified to testify on the subject and he described the method by which human bodies are cremated, making the assertion that bones will not burn to destruction, that after being submitted to enormous heat they are then crushed and reduced to a powder form. The effect of this evidence was that an entire body was not burned in the car to the extent described and that it would have been impossible to apply heat to a body in an open space or in a car that would consume the amount of missing bone. The State had on the witness stand several doctors undoubtedly authorities on the subject, some connected with the medical college, yet no effort was made to refute this testimony other than to discount the witness. It is significant that the State was in position to refute the claim of the scientific fact relied upon by defendant, if it be not correct. Appellant insists that this evidence is conclusive and should be so respected, regardless of the jury's finding to the contrary. We are unable to so view it.

In "Legal Medicine and Toxicology." Second Edition, Volume II, page 876, we find a discussion referring to the history of numerous cases in courts of other jurisdictions which bear upon the admissibility of this evidence and the conclusive effect of it. In the famous trial of Professor Webster, 1850, it was shown that an effort to burn a body in open air did not succeed after working an entire night. The case of State v. Calder, 59 Pac. R. 903, gives a history of the burning of two bodies for ten hours on an open fire and describes the recovered pieces of bone as filling a ten gallon lard can. In the Roxalana Druse

case, 1885, it was found that a human body weighing one hundred forty pounds could be burned in a wood stove in eight hours and that only one and a quarter pounds of fuel would be required for each pound of mixed animal tissue. The condition of the remaining bones is not given. It is noted that in none of the cases discussed in this valuable treatise do we find the subject exhausted, because all available fuels have not been considered. What may be accomplished by a blow-torch of a modern type does not seem to be discussed in the books. Consequently, we arrive at the conclusion that this Court is unable to say from the evidence in the case as it is presented in the record that human experience and scientific knowledge will support the conclusions of the witness, R. C. Maxwell, who testified that the bones of the human body are indestructible. The jury disregarded this evidence on an important issue of fact and we are unable to say that it was not within their power to do so.

Assuming that the State has discharged its burden of proving the identity of the remains as that of Franklin, it then becomes pertinent to consider the evidence establishing the fact that his death resulted from the act of another. All the circumstances of the case may be considered by the jury in determining this fact. He was in apparently good health for a man of his age. He left his home at the regular time and there was nothing unusual in his manner or in any statement made by him, indicating that he would do other than go to his office in the regular way. His car, the identifying objects heretofore enumerated and the remains of the body were found at a place not in the course of his usual habit of traveling. The disappearance of a party from the community is a circumstance sometimes of more significance than others, depending upon the surrounding conditions. It appears that his course for the day was diverted by some outside influence and the party last shown to have been in contact with him was appellant. There is nothing about the physical remains that would indicate the nature or extent of any wounds inflicted on him and nothing that would involve appellant to the exclusion of another or others. An examination of a portion of the lung by a physician indicates the probability of death by some other means before the burning of the body. Both sides are agreed and the evidence is conclusive that, in the event the body is proven to be that of Franklin, some other and more powerful heat was applied to the body than that which the burned portion of the car would furnish. The writer thinks it is equally as impressive that a stronger physical force would be required to handle the necessary fuel and to burn the body than the strength of the appellant alone

could possibly furnish. This goes to the next question to be considered.

While it is sufficiently proven that the remains of the body found in the car had been subjected to a fire greater than that which the car had produced and that death preceded the burning yet the evidence is insufficient to show the manner in which life was lost. The question of appellant's participation in whatever crime was proven in a manner sufficient to make her a principal under the law is one of equal importance to the State with that of any other question and is the weak place in its case. Circumstantial evidence sufficient to comply with the law is claimed by the prosecution in order to support the conviction. As is frequently the case, we find difficulty in distinguishing suspicious conduct from circumstantial evidence leading to a reasonable and logical conclusion and excluding the possibility of any other than that of her guilt.

Appellant, for no reason stated in the record, remained away from the office, knowing that her superior would not be there and fully aware that the only employee was one given no responsibility in the business of the company. The reason for her absence is unexplained by any fact or circumstance other than her connection with the disappearance of Franklin. No reasonable mind could doubt that she is in possession of the true facts and would be able to tell the story of his death or disappearance. She did not testify. It would be inhuman if a juror failed to have a prejudice against her case because of these circumstances. The suspicion is great. If she were probably away from her work it could be explained, and the occasion was one calling for the explanation. She chose to withhold it, as is her legal right. Thus she has confused and augmented the suspicions against her, so as to make it difficult to distinguish the case from one which would support a conviction. The jury did not make the distinction.

Appellant met her friend, Rabouin, at the appointed hour in the afternoon of November 12 and was with him, acting in a normal manner and the usual course of conduct, until a late hour, when she was informed while sitting in the car in front of her apartment that the officers were looking for her in connection with the death of Franklin. Apparently this was the first time she was advised the officers were investigating the matter. She was questioned by them for several hours, but not taken into custody. As she left her companion, she asked him to be in an appointed place so she could communicate with him, which she did at a very late hour at night. They went in a car

and she told him something about it. She had the pistol which she had purchased and told him that it was not registered, for which reason she must hide it. They stopped at a vacant place and threw a bag containing the pistol and other things into the weeds and went home. Rabouin had some curiosity about the contents of the bag and he returned alone to find it. Taking the pistol and cartridges, he threw away some articles of clothing. He then drove to the bayou and from the middle of the bridge, threw the pistol into the channel where there was about thirty-five feet of water. Some ten days later, he was called on and related these facts to the officers who recovered articles of clothing near the spot where they had been thrown and on which there was some evidence of human blood. The pistol and the cartridges were also recovered from the water. All of these things were introduced in evidence and sufficiently identified so that the jury could find that they belonged to her. She had a pair of shoes which she had Rabouin secure from hiding and clean them. They were later found in her apartment. He testified that some dirt on them was the same as at the spot where the burned car was found. On the previous day she was wearing boots. The potency of this evidence fails because it is not shown that this dirt is any different from that which may be found at any other place in the vicinity.

Failing in the proof that Franklin died from gunshot wounds, the evidence regarding the pistol loses its potency.

On the face of the record made by the State showing that the party found in the automobile was dead before being burned, the presence and assistance of more than one person will be the logical conclusion. Certainly appellant could not have handled the dead body of a two hundred pound man and have succeeded in applying heat from any source to consume the body, with her own physical strength unaided by another. The evidence produced to show her presence fails to include anything to indicate any strenuous physical strain on her part, and we are unable to find that which may be relied upon by the State to support a verdict and the conclusion that Helen O'Keefe, personally, was present and took the life of J. C. Franklin by any manner known or unknown. On questions of the sufficiency of the evidence, the State relies upon the very exhaustive opinion of Judge Hurt in Kugadt v. State, 44 S. W. 989. The similarity of the two cases is readily recognized, yet they are quite different in the more material aspects. Kugadt lived with his sister in a rural community. Taking her luggage prepared for her return to Europe, they started to Brenham for the purpose of boarding a train. She had several hundred

dollars in money. The evidence shows she never reached the depot and did not make the journey. The remains of a human body were found burned beyond recognition and as soon as this was publicized, Kugadt made his escape from the country. No other person in that community was missing and the finding of the body could be accounted for in no other manner than that it was the body of his sister. Under these circumstances, this fact was capable of proof by the method resorted to. Not so in the case of Franklin, who lived in a large city. Neither is the connection of appellant with Franklin charged with just the responsibility that it was in the Kugadt case. He had charge of her and was taking her to a train. He made a confession of his presence and the complaint was that the evidence was insufficient to prove the corpus delicti. Under a circumstantial evidence case, a different measure of evidence in proof ·of the corpus delicti is required where there is a confession than that which the law demands in the absence of a confession. We commend the opinion in the Kugadt case and call attention to the fact that it required clear and satisfactory proof to show that the object is the mutilated remains of a human body and "of one answering to the sex, age, and description of the deceased." It furthermore says that the "agency of the prisoner in their mutilation, or in producing the appearance found upon them, ought to be established." The evidence was stronger than the evidence of the instant case on the question of identity and on the question of the presence and connection of the accused with the homicide. But the opinion links all of this "with appellant's confession" in order to find ample proof of the identity of the remains and the connection of the accused with the crime, concluding "but when proof of this character is relied upon, the evidence should be clear and strong, fully complying with the rule laid down in regard to the proving of a case by circumstantial evidence." We do not think that the Kugadt case goes so far as the State asks us to go in the instant case. See Burrill on Circumstantial Evidence, pages 125, 303, 321, 491 and 682.

The State will be required to offer some proof either by direct testimony or conclusive circumstances to show the presence of appellant at the time and place where the life of the deceased was taken, or that she was engaged at the very time in aiding in some way the perpetration of the crime. It will not be sufficient to show that she knew the life had been taken or even that she helped handle the body after the crime was committed. We find in the record no intimation whatsoever as to the time and place of the homicide. Certainly there is no evidence that she was acting with another in such manner that she could be held to be a principal. We think the· conclusion inescapable that this

voluminous record, indicating remarkable skill and earnestness on the part of those charged with investigation of crime, nevertheless falls short of the law's requirement.

The foregoing will be sufficient to dispose of the case as it is now before us. All bills of exception will be considered overruled unless they are specifically herein sustained.

During the trial of the case, the State placed on the witness stand a party brought from the penitentiary named Leo Giordenella, who was expected to testify that appellant had approached him to secure his services in inflicting an injury on the deceased. The witness did not give the testimony expected but made a statement directly contradicting the evidence offered by the State through another witness. The State then sought to impeach Giordenella both by cross examining him and by calling an officer to testify as to statements made by Giordenella to the officer along the lines indicated by the questions. The witness had told the district attorney that he would, when placed on the witness stand, tell the truth, and the prosecution had a right to expect him to tell the same thing he was reported to have told the investigating officer. His failure to do so was a surprise. Had this resulted in the mere failure to make proof of a fact which the State hoped to show by him, the impeaching testimony would not have been admissible—Branch's A. P. C. Section 164, page 95, and authorities there cited—but where the statement made by the witness contradicts some fact proven and relied upon by the party placing him on the stand in addition to surprising the side which offered him, the rule is different. We quote from the above section of Branch, as follows: "The State may impeach her own witness by proof of contradictory statements where he testifies to either affirmative or negative facts injurious to the State's case." See authorities cited, and especially Baum v. State, 133 S. W. 271. A more recent opinion on the subject restating the correct rule is found in an opinion by Judge Lattimore in Hughes v. State, 272 S. W. 474. See also Williford v. State, 37 S. W. 761. The same reasoning will apply to appellant's bill of exception number eleven and the conclusion may be reached that the exception cannot be sustained.

Several bills of exception which will be considered together complain of the action of the court in admitting in evidence certain checks drawn on the company, bearing the signature of appellant, together with the endorsement of the names of the payee on such checks on the back thereof which were shown to have been in the handwriting of appellant. This evidence

taken together is sufficient to fasten upon appellant who was being tried for murder the extraneous offense of forgery. "When an extraneous crime or other transaction is a part of the res gestae * * *, or tends to connect defendant with the offense for which , he is on trial, proof of same is admissible." Branch's A. P. C., Section 166 (and authorities cited). Likewise, proof of other offenses may be admissible evidence for the purpose of showing motive if in fact they are of value in doing so. There may be other conditions under which proof of the commission of extraneous crimes may be admitted but there can be no contention in the·instant case for the admissibility of such evidence except on the issue of motive.

It is unnecessary to restate the exceptions to the rule forbidding proof of other crimes. We have only to consider the facts and circumstances of this case to determine whether or not, as a matter of fact, the killing of Franklin by appellant could have had any effect on the status of appellant with reference to the other proven crimes. If the forgeries had some relationship to the homicide, then the objection would go only to the weight of the evidence. If they had none, the objection goes to the admissibility. A conclusion on the question is of supreme importance to the prosecution and has given this court unusual concern. We confess our inability to understand from the record just how the appellant could expect to have received benefit by the death of Franklin, and it is indicated that she did not. Franklin had examined auditors' reports which had been made of the company's books and declined to accept them as being satisfactory. We have no way of concluding that such audits were unsatisfactory because they did not properly handle the forged items, contrary to the wishes of Franklin, as the State evidently reasoned. They were all made before the date of the forgeries. It appears that another audit was being considered, which probably would reveal the shortage, but the death of Franklin in this mysterious manner should be expected to hasten the audit rather than delay or prevent it. In the event that trouble should arise about the matter, we have no way, in view of the facts before us, of saying that she hoped to escape the consequences of her crime more satisfactorily with Franklin out of the way than with him present. It is hardly probable that this question has heretofore been presented in the same way as in the instant case, so that authorities decisive of it are not readily available. Polanco v. State 106 S. W. (2d) 1057 contains what may be relied upon as a helpful discussion in addition to those hereinabove referred to. See also Sections 1882-83, Branch's A. P. C., pages 1046-47. All bills of exception com-

plaining of the proof of the forgery will be sustained. The motion for a new trial should have been granted.

For the reasons stated, the judgment of the trial court is reversed and the cause remanded.

### ON MOTION FOR REHEARING.

KRUEGER, Judge.

The State, by and through its able District Attorney, has filed an exhaustive motion for rehearing and made a very ingenious argument in support of the contention that we erred, first, in holding the evidence insufficient to establish the appellant's connection with the death of Franklin; and, second that the introduction in evidence of the forged checks was not admissible on the theory that they showed a motive for the commission of the alleged offense. These matters were fully discussed by us in the original opinion and we do not think that we could add anything which would more clearly express our views on the subject under consideration than what we have already said. However, in view of the ardent and enthusiastic presentation of the State's contention, we will make a few pertinent observations.

The State's case rests entirely upon circumstantial evidence. The law relative to the sufficiency of circumstantial evidence, to sustain a conviction, need not be re-stated here as it has been heretofore stated by this court in numerous cases. For a discussion of the same, we refer to the case of Clifton v. State, 39 Tex. Cr. R. 619. The rule there announced has been consistently adhered to by this court.

We do not believe that the facts and circumstances proved connect appellant with the death or murder of J. C. Franklin. How, where, by whom and by what means Franklin came to his death is not shown by the evidence. Much stress is laid in the argument on isolated circumstances. For instance, the State earnestly insists that there is evidence in the record showing that the shoes of the appellant, a day or two after the commission of the alleged offense, were muddy, and that the mud on these shoes was similar to that on the bank of the San Jacinto River, where the purported body of Franklin was discovered in his car. However, there is no evidence that the dirt was different from any soil in and about Houston, nor were any tracks of any lady found in and about the car. If the ground was muddy, a lady's tracks would easily be visible. Much stress is also laid

on the fact that there was blood on her shoes, but there is nothing to show that it was human blood. It is also claimed that there was blood on her stockings and that there was human blood on her gloves, but there is nothing to show that this blood corresponded with that of J. C. Franklin or that it did not come from any other source. There is nothing to show just how Franklin came to his death, but if it be conceded that he died as a result of violence, there is nothing which connects appellant with that violent act except suspicious circumstances which are not of sufficient cogency and probative force to justify her conviction. Certainly there is nothing to exclude the possibility that some one besides the appellant may have committed the offense.

We are not going to enter upon an extensive discussion of all the circumstances in this case as the matter has already been discussed at length in the original opinion. The prosecuting attorney and the officers are to be commended for the diligent efforts made in their endeavor to unravel the mystery which confronted them. That they failed to connect the accused with the murder of J. C. Franklin is not their fault.

Now, with reference to the admission in evidence of the forged checks, it was shown that the checks made payable to Abel, Anderson, Stowers, Burleson and Roselle, were dated in the months of September and October, 1941, long after appellant contacted the States witnesses Usher, Rankin, Linn, Louvier, and Latham, and sought to employ each of them to beat up Franklin sufficiently to put him in the hospital. These alleged forgeries were extraneous offenses and were offered in evidence upon the theory that they showed a motive for the murder of Franklin. The State's contention in the court below, as well as in this court, is that she sought to get Franklin out of the way in order to prevent the discovery of these forgeries. The evidence fails to support such a theory because these forgeries were committed subsequent to the time she sought to induce the named persons to beat up Franklin. But even if these forgeries had been committed previous to the time she sought to employ these parties to beat up Franklin, we fail to understand how it would have prevented the discovery of the forgeries. Any member of the Board of Directors could have discovered them as well as Franklin. But she did not want him killed. She merely wanted him beat up. Consequently the forged checks did not establish a motive as contended for by the State.

The motion for rehearing is overruled.

The foregoing opinion of the Commission of Appeals has been examined by the Judges of the Court of Criminal Appeals and approved by the Court.