Curtis Paul HARRIS, Appellant,

v.

The STATE of Texas, Appellee.

No. 69224.

Court of Criminal Appeals of Texas,
En Banc.

Sept. 24, 1986.

On Motion for Rehearing
March 11, 1987.

Michael A. McDougal, Conroe, for appellant.

Bill Turner, Dist. Atty., and E. Hubbard Kennady, III, Asst. Dist. Atty., Bryan,

Robert Huttash, State's Atty., Austin, for the State.

## OPINION

ONION, Presiding Judge.

This is an appeal from a conviction for capital murder [1] in which the death penalty was imposed after the jury affirmatively answered the special issues submitted under Article 37.071, V.A.C.C.P.

Appellant's previous conviction for the same offense was reversed because he was denied his constitutional right to confrontation of witnesses against him due to the trial court's refusal to allow effective cross-examination of the State's principal witness, Valerie Rencher, to establish her bias or motive in testifying. *Harris v. State*, 642 S.W.2d 471 (Tex.Cr.App.1982). Following a change of venue from Brazos County to Montgomery County, appellant was retried and again convicted of committing capital murder. [2]

At the outset we are confronted with a claimed error in jury separation. Appellant contends the trial court erred in allowing the jurors in this death penalty case to separate after the charge was given at the guilt stage of the trial, and before a verdict was reached. Appellant argues that the separation was without his consent, that the mandatory provisions of Article 35.23, V.A.C.C.P., were violated, and that the State failed to rebut the presumption of harm.

After the charge was given to the jury and the opening arguments of the State and defense at the guilt stage of the trial had been completed, the court declared a recess telling the jury to go to the jury room. It appears that during this recess the claimed separation took place. Immediately after the recess the record reflects:

"THE COURT: Are y'all ready?

"MR. PRICE (Defense Counsel): At this time, Curtis Paul Harris, the defendant in Cause Number 16,430 moves for a mistrial for reason that the jurors have separated in violation of 3523, The Code of Criminal Procedure; there having been no waiver of separation provision.

"THE COURT: Emphatically denied. The Court was in attendance with the jurors just for convenience for the ladies who are members of this jury. So when they leave tonight, the Courthouse to journey to the motel, they didn't have to walk to a dark parking lot and pick up their vehicles. So, the Court instructed them to go there, proceeded with them to the lot, and brought the cars back here. So, your motion is overruled.

"MR. PRICE: Further, your Honor, for the record, please, may the record reflect that the Court is not the officer in charge of the jurors.

"THE COURT: Whatever, your motion is emphatically denied."

Appellant made the jury separation one of the grounds set forth in his motion for new trial, alleging his lack of consent.

Appellant testified that he had not consented to the jury separation nor had he been given an opportunity to consent or not to consent to the separation. The State did not cross-examine. Appellant's counsel, Michael McDougal, testified:

"As far—I'll just reiterate what I just said and make that my testimony that I was never given the opportunity to consent or not consent to their being allowed to separate and leave the courtroom, for any purpose, whether it was to move their cars late at night or not. And, we did not consent to that. And I think Mr.

---

**1.** The indictment alleged in pertinent part that appellant on or about December 11, 1978

"did then and there unlawfully intentionally and knowingly cause the death of an individual, Timothy Michael Merka by striking him on the head with a hard metal object; and the said Curtis Paul Harris did then and there intentionally cause the death of said Timothy Michael Merka in the course of committing

the offense of robbery of the said Timothy Michael Merka. . . ."

**2.** The death penalty conviction of appellant's brother, Danny Ray Harris for the same offense was reversed for trial error in the court's charge. *Danny Ray Harris v. State*, 645 S.W.2d 447 (Tex.Cr.App.1983).

Price (defense counsel) has already made his statement back when it happened."

The record then reflects:

"THE COURT: And the Court made itself perfectly clear at that time, and went on the record at that time, and will go on the record for purpose of the Motion for a New Trial, at this time, in saying that I accompanied the jurors to—from the Courthouse to the County parking lot, especially the Court being concerned, at that time, with lady-jurors, who did—would have to walk during the night to their cars after we finished that night. And the court being concerned for the welfare of the lady-jurors, as well as the jurors in general, accompanied the jurors to the County parking lot, saw them to their cars, and the return of the cars to parking under the Courthouse and return here as a group. And the Court is positive that none of the jurors had access to any information or contact with other persons during this process.

"MR. McDOUGAL: Did the Court ride in the cars with each of them?

"THE COURT: That's a mathematical impossibility, as counsel well knows.

"MR. McDOUGAL: Is the Court aware of whether or not any of the jurors listened to their radios on their way back to the Courthouse?

"THE COURT: No, the Court's not aware of that.

"MR. McDOUGAL: Is the Court aware of where the gentlemen, men-jurors, were when the ladies were moving their cars?

"THE COURT: Yes, they were moving their cars, too.

"MR. McDOUGAL: You didn't—the Court did not go with the men to move their cars? They accompanied—

"THE COURT: The Court accompanied all of them down there.

"MR. McDOUGAL: To each of their cars?

"THE COURT: Yes.

"MR. McDOUGAL: They were all parked in the same place?

"THE COURT: Yes, in the County parking lot.

"MR. McDOUGAL: All twelve jurors?

"THE COURT: Were parked in the County parking lot, except, I think, Thomas Vittrup, his was not there. He parked over in his Dad's—about a block from here, but they all individually drove their cars back over here. Anyway, ground thirty-two is denied ground thirty-three is denied, ground thirty-four is denied, ground thirty-five is denied.... All right. Be denied and thirty-six is denied.

"MR. BRYAN (Prosecutor): Your Honor, could we have ... as to the separation of ... that was late in the evening? ...

"MR. BRYAN: It was late in the evening?

"THE COURT: Yes, it was late in 'the evening.

"MR. BRYAN: After working hours?

"THE COURT: After normal working hours, it certainly was. We agreed to stay late that night.

"Ground thirty-seven is denied. Okay, Curtis, would you stand?"

No other effort was made by the State to show the circumstances under which the separation took place. The State did not contest the lack of consent to the separation or the lack of opportunity to consent or refuse to consent to the separation. The jurors were not called, although juror Vittrup, who apparently had gone to "his Dad's ..." to get his car, was a witness at the hearing on the motion for new trial on another ground.

■ Article 35.23, V.A.C.C.P., gives the trial court the discretion to permit the jurors to separate in a felony case *until* the court has given its charge to the jury. After receiving the charge, the jury "shall be kept together" until a verdict is rendered or until the jury is finally discharged. Once the charge is given, Article 35.23, supra, allows the jury to separate only by permission of the court *and* with the consent of the parties.[3]

3. Article 35.23, V.A.C.C.P. (Jurors May Separate), reads:

The provisions of Article 35.23, supra, are mandatory. *Green v. State,* 510 S.W.2d 919 (Tex.Cr.App.1974); *Goodall v. State,* 501 S.W.2d 342, 343 (Tex.Cr.App. 1973); *Wells v. State,* 634 S.W.2d 868, 870 (Tex.App.-Houston [1st Dist.] 1982) pet. ref'd.

The statute requires reversal if the jury is allowed to separate after the court's charge has been given unless the defendant consents. *McDonald v. State,* 597 S.W.2d 365, 367 (Tex.Cr.App.1980), cert. den. 449 U.S. 1010, 101 S.Ct. 564, 66 L.Ed.2d 467 (1980); *Skillern v. State,* 559 S.W.2d 828 (Tex.Cr.App.1977). See also *Rhynes v. State,* 479 S.W.2d 70 (Tex.Cr. App.1972).

■ It is the defendant's burden to insure that the record shows that he or she did not consent to the separation. *McDonald v. State,* supra, at 367; *Green v. State,* supra; *Burgett v. State,* 646 S.W.2d 615, 619 (Tex.App.-Fort Worth 1983); *Taylor v. State,* 636 S.W.2d 600 (Tex.App.-El Paso 1982). "Where the defendant has established in the record that a separation occurred without his consent, the mandatory language of Article 35.23 raises a presumption of harm which the State must then seek to rebut." *Taylor v. State,* 636 S.W.2d, supra, at 602. See also *Reed v. State,* 595 S.W.2d 856, 857 (Tex.Cr.App. 1980); *Goodall v. State,* 501 S.W.2d 342, 343 (Tex.Cr.App.1973); *Decker v. State,* 570 S.W.2d 948, 950, n. 7 (Tex.Cr.App. 1978); *Trevino v. State,* 565 S.W.2d 938, 940 (Tex.Cr.App.1978); *Skillern v. State,* supra.

In order to afford the State an opportunity to rebut this presumption of harm, the

issue of improper jury separation must be raised during trial or in a motion for new trial. *Green v. State,* supra, at 922; *McDonald v. State,* supra, at 367; *McIlveen v. State,* 559 S.W.2d 815, 818–819, n. 1 (Tex. Cr.App.1977); *Taylor v. State,* supra, at 602.

■ The appellant raised the issue by his motion for mistrial during trial on the merits. While he might not have fully developed the facts then, he did allege the issue in the motion for new trial. At the hearing thereon he demonstrated that neither he nor his attorneys consented to the separation, nor were they ever given an opportunity to consent. The burden thus shifted to the State to rebut the presumption of harm.

Apparently trying to equate failure to object with consent, the State argues, for the first time, on appeal, that appellant did not object to the separation *before* the alleged incident. The record does not show that appellant was ever aware of the proposed separation or plan to have the jurors move their vehicles.[4] In fact, the record indicates the contrary. The State's argument is without merit.

The State also attempts to rely upon the "housing" exception in Article 35.23, supra, and contends the men and women jurors separated and moved their vehicles in anticipation of the separation of men and women for the night as permitted by the statute. This argument is totally meritless.

Argument is also advanced that the separation was a mere temporary "de minimus" apartness of the jurors while the trial judge, as the officer in charge, remained in control of the jurors. Such, the State

---

"The court may adjourn veniremen to any day of the term. When jurors have been sworn in a felony case, the court may, at its discretion, permit the jurors to separate until the court has given its charge to the jury, after which the jury shall be kept together, and not permitted to separate except to the extent of housing female jurors separate and apart from male jurors, until a verdict has been rendered or the jury finally discharged, unless by permission of the court with the consent of each party. Any person who makes known to the jury which party did not consent to separation shall be punished for contempt of court. If such jurors are kept overnight, facil-ities shall be provided for female jurors separate and apart from the facilities provided for male jurors. In misdemeanor cases the court may, at its discretion, permit the jurors to separate at any time before the verdict. In any case in which the jury is permitted to separate, the court shall first give the jurors proper instructions with regard to their conduct as jurors when so separated."

**4.** The record does not show that the State was ever informed of any plan to have the jurors separate and move their vehicles.

claims, was not an illegal separation. Without discussing the inadvisability of the trial judge acting as jury shepherd despite noble motives, particularly at this point in the trial, the record simply does not show the length of time the jurors were separated, the distance between the county parking lot and the places where the jurors' vehicles were eventually parked, how long it took juror Vittrup, who went to "his Dad's ... about a block from here" to rejoin the other jurors, etc. The trial judge did state he was positive none of the jurors had access to any information or contact with other persons. It was shown, however, he was not with all the jurors at all times during the separation and certainly not with juror Vittrup, who went to "his Dad's."

The facts of the case, or lack of facts, distinguish this case from those cited by the State. Unlike *McIlveen v. State,* 559 S.W.2d 815 (Tex.Cr.App.1977), the prosecutor here did not obtain the testimony of jurors and rebut the presumption of harm, nor did the judge poll the jury as in *O'Neil v. State,* 642 S.W.2d 259 (Tex.App.-Houston [14th Dist.] 1982) no pet.

It may have been relatively easy to rebut the presumption of harm, see *Barnett v. State,* 50 Tex.Cr.R. 538, 99 S.W. 556 (1907); *McIlveen v. State,* supra, but no effort was made by the State to call the jurors or other witnesses to rebut the presumption. The State relied alone upon the trial judge's remarks. This was not enough.

A jury separation statute and the presumption of harm is not new nor peculiar to Texas. A brief history thereof was discussed in the concurring opinion in *Skillern v. State,* 559 S.W.2d 828, 832 (Tex.Cr. App.1977). Once the issue of jury separation was raised in the motion for new trial, a quick research of applicable cases would have revealed what steps could have been taken to rebut any presumption of harm. This is the second time that this case has to be reversed on trial error. This Court, however, is bound by the record made in the trial court below.

The judgment must be reversed.

While the jury separation error necessitates reversal, the appellant advances sufficiency of evidence and related questions which must be reviewed and answered. For this purpose we shall briefly summarize this voluminous record.

Valerie Denise Rencher was the State's chief witness. She saw the appellant kill the deceased, Tim Merka. Rencher, 15 years old, had moved to Bryan in the Fall of 1978, and was in the ninth grade. She had been dating appellant for a month and a half before the night of December 11, 1978. On that night she was with the appellant, his mother and sisters at the Harris home in Bryan. While there James Manuel, known as "Dirty Red," and appellant's brother Danny Harris, came to the house in a Ford Torino. Rencher and the appellant left with these two in the Torino about 7:30 p.m. After driving awhile, Danny Harris decided he wanted to see Ann Chambers, who lived on Sandy Point Road. Upon arriving at the Chambers' house, they discovered Ann was not at home. The Torino would not then start and the three men began to beat on the car and tear up the interior. Danny Harris broke out the window on the driver's side with a tire tool. A man came out on the porch of a nearby house, and in response to a question told the group he did not have any jumper cables. According to Rencher the group then started walking down the middle of the road when a pickup truck approached which Danny flagged down. The driver was a heavy-built white male of medium age who was wearing blue jeans, checkered shirt and a jacket. The driver backed his truck up to the Torino, and worked in vain for 20 to 25 minutes trying to start the Torino with jumper cables. The pickup truck driver told Danny he didn't think the car was going to start but Danny said "Keep trying." Rencher then saw Danny Harris and Manuel go behind the Torino and heard James Manuel say "No, man, my arm is still out of place." Then she heard Danny tell the appellant Curtis Harris "We going to drive this man." Rencher then saw Danny push the white male in the chest, causing him to fall on his back, then pin the man's arms down while putting his

weight on top of the fallen man. Rencher then saw the appellant hit the man, whom his brother was holding down, in the head with an automobile jack. The man asked what they wanted. Rencher, surprised by these violent actions, asked the appellant not to hit the man again, but the appellant hit him again hard enough to kill him. Rencher, being scared, got into the pickup truck, and heard and saw appellant hit the man at least six more times. The appellant got in the truck along with James Manuel, who had taken the man's wallet and apparently some papers. Danny Harris got in the driver's seat. Rencher, sitting next to the appellant, who was bloody, got blood on her off-white colored jacket. She noticed appellant also had blood on his tennis shoes. They drove to the Harris home in Bryan where the appellant and his brother Danny changed clothes. The foursome then drove towards Navasota, but ended up in Waller. In Waller Manuel got out of the truck with a shotgun in his hand, a shotgun that had been found in the pickup truck that night. After leaving a U-Totem store in Waller, they drove back to Bryan, arriving about midnight, and went into the woods behind the Harris house for about five minutes. Danny Harris then drove out of the woods, let Rencher and appellant out and said he was going to "dump that man's truck." Danny arrived at the Harris house about five minutes later. Rencher and appellant spent the night at the house.

Valerie Rencher testified she washed the blood off her coat which she had gotten from sitting next to the appellant in the truck. She stated it "wasn't evidence. To me it wasn't then. At that time I was young and I was more shocked and scared more than anything. I didn't know what they'd do to me while I was out there."

Rencher made two voluntary statements less than a week later, and before she knew of any plea agreement. She understood later that she would get 10 years in the penitentiary if she would "just tell the truth." She did not know what she was being charged with, but thought she could be charged as an adult for capital murder.

Avis Morgan placed both Harris brothers, Manuel and Rencher at the Harris home about 6:30 to 7 p.m. on the date in question. He also knew Manuel as "Dirty Red."

An hour and a half or so later on December 11, 1978, Elmore Green, Jr., heard a car on Sandy Point Road near the front of his house. Someone knocked on Ann Chambers' door and no one answered. Green heard bottles being thrown and a car being kicked. When Green went to his front door, one of the men in the group asked for jumper cables and Green told him that he did not have any. He heard one of the men call another "Dirty Red" and he knew that was what James Manuel was called, but it was dark and he could not clearly see them. He knew there were four black individuals, one being a female wearing a white sweater blouse. Green saw them "beating on the car" and then start to walk on the road towards Highway 50. Twice he said that "they" flagged down an approaching truck, and one time he said the female flagged down the truck. He saw the white male driver of the pickup truck pull the truck near the other car and raise the hood of the truck. He heard a car engine "turning over" and he went to sleep. The next morning he testified that the white male was the same man whose body he saw lying in the ditch at 6 a.m. Green called the police.

Several officers arrived at the scene. Sheriff Bobby Yeager testified about finding the body of Merka at the scene as well as a bumper jack shaft and bumperjack ratchet with blood and hair on each instrument. A claw hammer with blood on the handle was found under Merka's body.

The cause of death was multiple severe injuries to the head and the brain. There were 15 lacerations to the head which were consistent with having been inflicted by the bumper jack shaft and ratchet mechanism found at the scene.

The Merka 1978 GMC pickup truck was found later at 10 a.m. on December 12, 1978, on the Old Mumford Road in Bryan approximately four blocks from the Harris house. There was blood on the front seat

and blood and hair on the toolbox. Later the same morning a deputy sheriff went to the Harris house and took the tennis shoes directly from appellant's feet. There was blood on the shoes. A chemist identified the blood as human blood, but there was not enough in order to determine blood type.

Elbert Warren testified that on December 15, 1978, Danny Harris sold him a shotgun while the appellant was present. Warren identified the shotgun as the one he purchased and sold to Chick Chatum from whom it was recovered. The shotgun serial number 177186 was the same number of the shotgun on an insurance policy owned by the deceased Tim Merka. Donald Evans, a co-worker of the deceased, saw the Winchester 12 gauge shotgun in Merka's pickup on the night of December 11, 1978 before Merka left his job between 8:45 and 9 p.m.

Barbara Gilmore King, the assistant manager at the U-Totem grocery store in Waller, testified at about 11:30 p.m. on December 11, 1978, the night of the alleged offense, appellant was one of three men who entered her store with a shotgun.[5]

On March 22, 1979, Ricky Kearney found Merka's Texas A & M identification card, a gun case, a payment book and a 1978 GMC Driver's Manual in the woods behind the Harris house. The gun case was identified by the deceased's wife as belonging to her husband. There was, of course, additional testimony, but we do not conclude a further recitation is essential.

With this background we turn to appellant's contention that the trial court erred, over timely objection, in failing to charge that Valerie Denise Rencher was an accomplice witness as a matter of law. It is observed that the court did submit to the jury the fact issue of whether Rencher was an accomplice witness or not.

■ By virtue of Article 38.14, V.A.C. C.P., a conviction cannot be had upon the testimony of an accomplice unless that testimony is corroborated by other evidence tending to connect the defendant with the offense committed, and the corroboration is not sufficient if it merely shows the commission of the offense.

■ It has been said before and after the adoption of the 1974 Penal Code that an accomplice witness is someone who participated with another before, during or after the commission of a crime. *Brooks v. State*, 686 S.W.2d 952, 957 (Tex.Cr.App. 1985); *Harris v. State*, 645 S.W.2d 447 (Tex.Cr.App.1983); *May v. State*, 618 S.W.2d 333 (Tex.Cr.App.1981); *Russell v. State*, 598 S.W.2d 238 (Tex.Cr.App.1980), and cases there cited; *Easter v. State*, 536 S.W.2d 223, 226 (Tex.Cr.App.1976); *Singletary v. State*, 509 S.W.2d 572 (Tex.Cr.App. 1974). One is not an accomplice witness, however, who cannot be prosecuted for the offense with which the accused is charged. *Villarreal v. State*, 576 S.W.2d 51 (Tex.Cr. App.1979); *Ferguson v. State*, 573 S.W.2d 516 (Tex.Cr.App.1978); *Russell v. State*, *supra*; *Brooks v. State*, *supra*. If a State's witness has no complicity in the offense for which an accused is on trial, his or her testimony is not that of an accomplice witness whatever may have been his complicity with the accused in the commission of other offenses. *Easter v. State*, 536 S.W.2d 223, 225 (Tex.Cr.App.1976), and cases there cited; *Brooks v. State*, *supra*.

In *Easter v. State*, supra, it was observed that the 1974 Penal Code had made some notable changes with regard to parties to a crime, and that an accessory (to the person) after the fact[6] had been eliminated as a party to a crime and replaced with a separate and distinct crime of "hindering apprehension or prosecution." See V.T.C.A., Penal Code, § 38.05. While an accessory was an accomplice witness under the former code, this is no longer true.

---

5. She identified the shotgun in question as the same one she had seen that night, but at another point was unable to make a positive identification.

6. Article 77, V.A.P.C., 1925, provided in part:

"An accessory is one who, knowing that an offense has been committed, conceals the offender, or gives him any other aid in order that he may evade an arrest or trial or the execution of his sentence...."

*Easter v. State, supra; Emmett v. State,* 654 S.W.2d 48, 49 (Tex.App.-Dallas 1983).

The mere fact that a witness was present when the crime was committed does not compel the conclusion the witness is an accomplice witness. *Brooks v. State, supra; Brown v. State,* 640 S.W.2d 275 (Tex.Cr.App.1982); *Arney v. State,* 580 S.W.2d 836 (Tex.Cr.App.1979); *Easter v. State, supra,* at p. 225. Further, a witness is not deemed an accomplice witness because he knew of the crime but failed to disclose it or even concealed it. *Easter v. State, supra,* at p. 225; *Carrillo v. State,* 591 S.W.2d 876 (Tex.Cr.App.1979). See also *Villarreal v. State, supra; Russell v. State, supra.* Tex.Jur.3rd, Vol. 25, Criminal Law, § 3443, pp. 272–273.

"Furthermore, even though the witness was an actor in the criminal transaction he is not regarded as an accomplice if he did not act knowingly or willingly, or if he was too young to be criminally responsible." Tex.Jur.3rd, Vol. 25, Criminal Law, § 3443, pp. 274–275.

The evidence in a case determines what jury instruction needs to be given on an accomplice witness. Whether a witness is an accomplice witness so as to require corroboration of his testimony is frequently difficult to determine.

■ If the evidence clearly shows that a witness is an accomplice witness as a matter of law, the trial court must so instruct the jury. *Harris v. State, supra,* at 454; *Arney v. State, supra,* at 836; *Allen v. State,* 461 S.W.2d 622 (Tex.Cr.App.1970). And failure to do so may constitute reversible error. Tex.Jur.3rd, Vol. 25, Crim. Law, § 3444, p. 281; *Bolin v. State,* 505 S.W.2d 912 (Tex.Cr.App.1974). See also *Gonzales v. State,* 441 S.W.2d 539 (Tex.Cr.App.1969).

Where there is a conflict in the evidence, a doubt or question, as to whether a witness is an accomplice witness, it is proper to submit the same as a fact issue to the jury even though the evidence seems to preponderate in favor of the fact that the witness is an accomplice witness as a matter of law. *Gonzales v. State, supra; Allen v. State, supra; Ward v. State,* 520 S.W.2d 395 (Tex.Cr.App.1975); *Villarreal*

*v. State,* 576 S.W.2d 51 (Tex.Cr.App.1979), *cert. denied* 444 U.S. 885, 100 S.Ct. 176, 62 L.Ed.2d 114; *Colunga v. State,* 527 S.W.2d 285 (Tex.Cr.App.1975); *Brown v. State,* 640 S.W.2d 275 (Tex.Cr.App.1982); *Harris v. State, supra,* at 454. See also *Drummond v. State,* 624 S.W.2d 690 (Tex.App.-Beaumont 1981) (With facts similar to the instant case.).

If the evidence is clear that a State's witness is not an accomplice witness, no charge need be given the jury thereon. *Villarreal v. State,* supra, at 51; *Danny Harris v. State, supra,* 645 S.W.2d at 456; *Silba v. State,* 161 Tex.Cr.R. 135, 275 S.W.2d 108 (1954).

Appellant argues that by her testimony Valerie Rencher established "(1) she was present at time of alleged murder; (2) she had blood on her clothing after the event; (3) that she knew her companions were going to 'jump' the man; (4) she was the first one to get into the deceased's truck; (5) she would get no more than ten years in the pen if she cooperated in the investigation; (6) she was kept in detention until after she gave her testimony; (7) she was charged with the offense of capital murder of Timothy Michael Merka; (8) she did not leave the scene of the event when she had the opportunity; (9) she did not report the event when she had a chance." Appellant also points out Elmore Green, Jr., testified Rencher was the one who initially stopped the deceased's truck.

The State responds that Rencher was 15 years old at the time, had gone with the appellant and his brother Danny Harris and James Manuel to see Danny's girlfriend, whom they found was not at home. Their car wouldn't start and they began walking down the road when the deceased drove down the road. The State argues that Rencher did not participate in the planning or promoting the offense, and did not know what was about to occur, and that mere presence at the scene does not an accomplice witness make. There was some dispute about whether Rencher knew the expression "drive" meant "jump on." Apparently she suspected only shortly before the attack what was about to happen. She

testified she entered the deceased's truck out of fear for her life and after pleading with appellant to stop beating the deceased. She related the blood on her clothing was placed there when appellant, who was bloody, got in the truck and sat next to her. Further, the State notes that the fact that Rencher knew of the offense and did not immediately report it, did not, under the authorities earlier cited, make her an accomplice witness.

There was conflict in the evidence as to who initially stopped the deceased's vehicle. Rencher testified all four were walking down the middle of the road when the deceased's vehicle was stopped by Danny Harris. Elmore Green, Jr., saw the three males and one female in the middle of the road and testified "they" flagged down the approaching truck, then he stated the female flagged down the truck, and later related "they" stopped the truck.

The record does not show that Rencher was "charged" as an adult with the murder of the deceased Merka. There was a petition for discretionary waiver of juvenile jurisdiction filed in the Juvenile Court of Brazos County on December 28, 1978, alleging that Rencher had caused the death of Merka. This was a civil proceeding. She was ordered detained. On June 13, 1979 the petition was denied and the juvenile action dismissed in 1980. The instant trial commenced in June 1983. At one time there had been a discussion with Rencher's attorney that if Rencher testified for the State and was certified for trial as an adult that the State would see that she didn't get more than 10 years. She was not in detention at the time of the instant trial.

■ Appellant thus contends Rencher was an accomplice witness as a matter of law and he was entitled to a proper charge, and the State contends Rencher did not participate in the offense. We conclude that the trial judge, under the circumstances, did not err in submitting to the jury the issue of accomplice witness as a fact question, which is a proper submission even when the evidence seems to preponderate in favor of the fact that the witness is an accomplice witness. *Gonzales v. State*, 441 S.W.2d 539 (Tex.Cr.App.1969); *Allen v. State*, 461 S.W.2d 622 (Tex.Cr.App.1970); *Brown v. State*, 640 S.W.2d 275 (Tex.Cr. App.1982).[7]

We further observe that in *Danny Ray Harris v. State*, 645 S.W.2d 447 (Tex.Cr. App.1983), the conviction of this appellant's brother for murder of Merka was reversed. Rencher's testimony was the same or similar as in appellant's two trials. The trial court in Danny Harris' trial refused to charge at all on the issue of Rencher being an accomplice witness. In reversing on that basis, this Court held that the court should have submitted to the jury the fact question of whether Rencher was an accomplice witness. This Court did not conclude there that Rencher was an accomplice witness as a matter of law.[8]

Nevertheless, appellant argues in another ground of error that the evidence is insufficient to support the conviction for capital murder because due to the lack of corroboration of the accomplice witness' (Rencher's) testimony.

In *Gonzales, supra,* 441 S.W.2d at 541, it was stated:

"It appears from these cases that where the court submits to the jury the fact question of whether a certain State witness is an accomplice witness when the evidence was such as to justify a charge that such witness was an accomplice as a matter of law and proper objection is reserved, the error does not require reversal unless the testimony of the witness is essential to the State's case (a) because if the witness is in fact an accomplice, there is no evidence to corroborate his testimony, or (b) because,

---

**7.** It is observed that at the hearing on the motion for new trial the appellant called juror Vittrup, who testified on direct examination that the jurors had considered the accomplice witness issue and found that Rencher was not an accomplice witness.

**8.** In fact, the Court wrote:

"We cannot say the trial court erred in failing to instruct the jury that Valerie Rencher was an accomplice witness as a matter of law." *Harris, supra,* 645 S.W.2d at 454.

without testimony of the witness (whether he be an accomplice or not) there is insufficient evidence to support a conviction or (c) because it is the sole corroboration of the testimony of another accomplice witness." See also *Kerns v. State*, 550 S.W.2d 91 (Tex.Cr.App.1977)."

Appellant thus argues the charge given was error and that while in many cases the error would not be reversible error it is in his case under subsection (a) of *Gonzales* set out above. We will briefly review appellant's contention.

"The test as to the sufficiency of the corroboration is to eliminate from consideration the evidence of the accomplice witness and then to examine the evidence of other witnesses with the view to ascertain *if there be inculpatory evidence, that is evidence of incriminating character which tends to connect the defendant with the commission of the offense.* If there is such evidence, the corroboration is sufficient; otherwise it is not." *Edwards v. State*, 427 S.W.2d 629 (Tex.Cr.App.1968) (Emphasis supplied.) See also *Cherb v. State*, 472 S.W.2d 273 (Tex.Cr.App.1971); *Dillard v. State*, 550 S.W.2d 45 (Tex.Cr.App.1977).

In this writer's original dissenting opinion in *Paulus v. State*, 633 S.W.2d 827, 837, 846 (Tex.Cr.App.1982), later adopted by the majority as the en banc opinion, it was stated after citing a number of authorities:

"As earlier noted, all the facts and circumstances in evidence may be looked to as furnishing the corroboration necessary. The corroborative evidence may be circumstantial or direct. Apparently insignificant circumstances sometimes afford the most satisfactory evidence of guilt and corroboration of the accomplice witness' testimony. It is not necessary that the corroboration directly link the accused to the crime or be sufficient in itself to establish guilt. The combined cumulative weight of the incriminating evidence furnished by the non-accomplice witnesses supplies the test. Each case must be considered on its own facts and circumstances and on its own merits."

Rencher made out a complete case by direct evidence against the appellant. Except for the requirements of Article 38.14, V.A.C.C.P., there could be no question of the sufficiency of the evidence to sustain the conviction. If, as appellant contends, Rencher was an accomplice witness, we would be required to apply the test set forth in *Edwards*, supra, and look to non-accomplice evidence.

Article 38.14, supra, makes clear evidence merely showing the commission of an offense is not sufficient alone to corroborate an accomplice witness, but it is a factor to be considered along with other possible factors in determining whether there is sufficient independent evidence to corroborate the accomplice witness. *Paulus*, supra.

The mere presence of the accused in company with the accomplice witness shortly before or after the time of the offense is not, in itself, sufficient corroboration of the testimony of the accomplice witness, however, when coupled with other circumstances may be sufficient. See *Nelson v. State*, 542 S.W.2d 175, 177 (Tex.Cr.App.1976); *Cherb v. State*, 472 S.W.2d 273 (Tex.Cr. App.1971).

Avis Morgan placed appellant, Rencher and James Manuel known as "Dirty Red" together at the Harris home about 6:30 or 7 p.m. Later Elmore Green, Jr., saw three black males and one black female near his home, and near the scene of the offense later to be committed. He could not identify them but heard one referred to as "Dirty Red." He knew Manuel was called "Dirty Red." They apparently had car trouble and later Green saw them stop a white man who got out of his truck to assist them. Eight hours later he saw the body of the same white man in a ditch near the same scene. About an hour after the alleged offense appellant was identified as being one of three men who were in a U-Totem grocery store in Waller with a shotgun. The witness was the assistant manager of the store. Rencher had testified they drove to Waller and that the three men got out of the pickup and that

they had the shotgun found in the deceased's truck.

The morning after the alleged offense human blood was found on appellant's tennis shoes. Rencher had said blood had gotten on appellant's tennis shoes.

Three days after the alleged offense appellant was present when his brother, Danny, sold the shotgun in question. The pickup truck of the deceased was found three or four blocks from appellant's home the next day after the offense. Other items belonging to the deceased were found in the wooded area behind the said home. There are other facts which could be discussed. We conclude that evidence independent of Rencher's tends to connect appellant with the crime charged, and even if Rencher was an accomplice witness as a matter of law, as appellant claims, the evidence would be sufficient to corroborate Rencher's testimony.

Appellant's ground of error is overruled.

In another ground of error appellant contends the trial court erred in denying his pre-trial "motion to dismiss the prosecution and special plea of double jeopardy."

Appellant observes that on December 18, 1978 a "Request for Order of Immediate Custody" was filed with Juvenile Court of Brazos County charging Valerie Rencher with murder; that on December 28, 1978 a "Petition for Discretionary Waiver of Juvenile Jurisdiction" was filed with said juvenile court charging Rencher with the murder of Merka, the deceased in the instant case. Appellant contends that Rencher was so "charged" at the time of his first trial and that such juvenile charge was equivalent to being under indictment as an adult for the same offense.[9] He argues that Rencher was therefore an accomplice witness as a matter of law at his first trial,

that her testimony was not corroborated as required by Article 38.14, V.A.C.C.P., at such trial and he was entitled to have the second prosecution dismissed on the basis of double jeopardy.

Appellant presented no authority in point to the trial court, nor presents any to this Court for the proposition that a pending juvenile proceedings (involving waiver of juvenile jurisdiction and certification of a juvenile for trial as an adult) is the equivalent to a pending indictment with regard to the accomplice witness rule.

■ We need not determine this question for the purpose of this ground of error. The appellant made no showing to the trial court at the hearing on his pre-trial motion that, even if Rencher was an accomplice witness as a matter of law, there was no independent evidence to corroborate her testimony at appellant's first trial. The instant trial occurred after the reversal of the first conviction and after a change of venue to another county. The trial judges were not the same. For the purpose of his pre-motion appellant did ask the second trial judge to consider or take judicial notice of the "statement of facts" from the first trial.[10] He obtained no ruling on his request, and no such statement of facts were presented to the trial judge. The trial court's action in denying the said pre-trial motion was not error given the circumstances.

Appellant places great emphasis upon a statement in our opinion reversing his first conviction: "The only evidence adduced at trial which connected appellant with the murder of the deceased was the testimony of Valerie Denise Rencher, appellant's sixteen year old girlfriend." *Harris,* 642 S.W.2d at 472.

9. Appellant cites *Etheredge v. State,* 542 S.W.2d 148 (Tex.Cr.App.1976), for the proposition that a witness is an accomplice witness as a matter of law where the witness has been indicted for the same offense for which the accused is on trial. See also *McCloud v. State,* 527 S.W.2d 885 (Tex. Cr.App.1975).

10. The court cannot take judicial notice by the testimony heard before him on another trial and enter judgment thereon. *Scott v. Clark,* 38

S.W.2d 382 (Tex.Civ.App.-Austin 1931); *Entrekin v. Entreken,* 398 S.W.2d 139 (Tex.Civ.App.-Houston 1966). See also *Rounsavall v. State,* 480 S.W.2d 696, 700 (Tex.Cr.App.1972) (dissenting opinion); 1 McCormick and Ray, Texas Practice, 2nd Ed., Evidence, § 152, 172. Even the so-called "judicial notice" rule in probation cases, *Barrientez v. State,* 500 S.W.2d 474 (Tex. Cr.App.1973), and its progeny, would have no application where different judges are involved.

In such opinion the court was focusing upon the question of whether the trial court had unduly restricted the Harris' constitutional rights to confront and cross-examine Rencher, the State's material witness, whose testimony was the only direct testimony connecting Harris with the alleged murder. In reversing on that basis the Court did not hold that Rencher was an accomplice witness as a matter of law nor did it hold that there was no independent evidence to corroborate an accomplice witness. Appellant's reliance upon the language in our earlier opinion is misplaced.

Further, was earlier noted, in *Danny Ray Harris v. State*, 645 S.W.2d 447 (Tex. Cr.App.1983), the conviction of appellant's brother for the murder of Merka was reversed. Rencher's testimony there was similar as in appellant's two trials. The trial court refused to charge at all on the issue of an accomplice witness. This Court reversed, holding that under the evidence the court should have submitted to the jury the fact question of whether Rencher was an accomplice witness. It was not concluded there that Rencher was an accomplice witness as a matter of law.

Appellant's ground of error is overruled.

■ Appellant also complains the evidence is insufficient to support the conviction since the State failed to prove the corpus delecti. The corpus delecti of murder consists of two elements: First, the body of the deceased must be found and identified. Second, the death of the deceased must be shown to have been caused by the criminal act of another. *Nathan v. State*, 611 S.W.2d 69 (Tex.Cr.App.1981); *Penry v. State*, 691 S.W.2d 636 (Tex.Cr. App.1985). It is appellant's argument here only that the body of the deceased was not sufficiently identified.

Appellant argues the only direct evidence to connect him with the alleged capital murder was that of Valerie Rencher; that she never did identify the deceased except by stating he was white, heavy built, and not "real young or real old" and by describing the clothing he was wearing. Appellant notes she never identified a photograph of the deceased and did not refer to

him by name. Appellant urges the record is silent as to any identification of the deceased *at the time* of the attack or subsequent thereto by anyone having personal knowledge of the event.

The record does reflect that Elmore Green, Jr., identified Tim Merka's photograph as the man he had seen on the night of December 11, 1978, drive onto Sandy Point Road in a pickup and whose body was found in a ditch the next morning.

Sheriff Bobby Yeager testified he was on the scene the next morning (December 12th) and the body he found on Sandy Point Road was that of Merka whom he knew and that he recognized him when the body was turned over. He identified known photographs of Merka as the same body he found. There was no objection to such testimony. Dr. J.C. Lee, the medical examiner who performed the autopsy, testified that the body was identified to him by Sheriff Yeager and that there was a ring on one finger which had the name "Tim Merka" printed on the inside of the ring. There was no objection to this testimony. Cf. *Boening v. State*, 422 S.W.2d 469, 473 (Tex.Cr.App.1967).

■ All the facts and circumstances in the case may be looked to in aid of and to determine the corpus delicti. *Black v. State*, 137 Tex.Cr.R. 173, 128 S.W.2d 406 (1939); *O'Keefe v. State*, 145 Tex.Cr.R. 349, 167 S.W.2d 1035 (1942).

The corpus delicti may be proved by circumstantial as well as direct evidence. *Saulter v. State*, 151 Tex.Cr.R. 550, 209 S.W.2d 184 (1948); *Simpson v. State*, 163 Tex.Cr.R. 385, 291 S.W.2d 341 (1956); Tex. Jur.3rd, Vol. 18, Crim.Law, § 223, p. 346. See also *Gonzales v. State*, 681 S.W.2d 270 (Tex.App.-San Antonio 1984). The determination of the corpus delicti is not as limited as appellant urges.

■ We conclude the evidence is sufficient to show the identify of the body as that of the deceased and as the man attacked. See *Gomez v. State*, 638 S.W.2d 133, 136 (Tex.App.-Corpus Christi 1982) pet. ref.d, which relies upon *Clay v. State*, 505 S.W.2d 882 (Tex.Cr.App.1974). See also

*Aubuchon v. State*, 645 S.W.2d 869, 873 (Tex.App.-Ft. Worth 1983), which relies upon *Estrada v. State*, 422 S.W.2d 453, 455 (Tex.Cr.App.1968).

The ground of error is overruled.

For the reasons stated, the failure to overcome the presumption of harm in the jury separation the judgment of the trial court is reversed and the cause remanded.

WHITE, J., dissents.

MILLER, Judge, dissenting.

I dissent to the majority's conclusion that based upon the facts of this case, the jury separation requires reversal.

Certainly under Art. 35.23, V.A.C.C.P., reversal of the case is required if, after the charge is given, the jury is allowed to separate without the defendant's consent. See *McDonald v. State*, 597 S.W.2d 365 (Tex. Cr.App.1980), and cases cited in majority at p. 212. Also, the defendant has the burden to make sure that the record reflects that he did not consent to the separation. *McDonald*, supra, at 367, citing *Green v. State*, 510 S.W.2d 919 (Tex.Cr.App.1974). If the defendant does sustain his burden, then the State must show that the separation did not result in harm to the defendant. *Skillern v. State*, 559 S.W.2d 828 (Tex.Cr.App.1977).

I cannot, however, accept the majority's conclusion that the State failed to rebut the presumption of harm in this case, therefore mandating a reversal. As proper rebuttal evidence, the record contains statements by the trial court showing, as I read them, the following:

1. The trial judge accompanied the jurors as a group from the courthouse to the parking lot.
2. The trial court accompanied the jurors to each of their cars.
3. The trial court saw the jurors move their cars *en masse* from where they were parked to the courthouse.
4. The trial court was "positive that none of the jurors had access to any information or contact with other persons during this process." Maj. at p. 211.

These facts show that the jurors did not make any outside contacts while moving their cars in the presence and view of the trial court.

The majority opinion, at p. 213, states that the record shows that the trial court "was not with all the jurors at all times during the separation and certainly not with juror Vittrup, who went to 'his Dad's.'" With all due respect, the record does not support this holding. On the contrary, the trial court states that he "accompanied all of them" (jurors) to each of their cars. No exception was made to this statement regarding juror Vittrup, who's car was parked "about a block from here [the court room]". The record is devoid of the proximity of Vittrup's "Dad's" to the county parking lot. In the face of the trial judge's statements, however, absent any refutation, we must assume that the trial court also accompanied him to his car. In sum, there is simply nothing in the record showing that the trial judge was not with any juror during the time the cars were moved.

With the record viewed as it actually appears, there is no evidence that the jurors had any contact with other persons, nor that appellant was harmed in any way by the separation. Thus, the State, through the trial judge's gratuitous statements, has met its burden of rebutting the presumption of harm.

One brief pause must be made to separate the facts of this case from those presented in *Skillern*, supra, which at first glance may appear similar. In that case, the bailiff and another witness testified that they had not seen the jurors speak to anyone, but clearly stated *they had not had the jurors in sight at all times during the separation*. This Court held that the testimony of a person under these conditions merely to the effect that he did not see a juror speak to anyone in a situation where he did not see the juror at all times, standing alone, constituted no evidence that such speaking did not occur. Absent sufficient evidence, the State had failed to sufficiently rebut the presumption of harm.

**222**

In the instant case, the trial court did not state that he did not see anyone speak to the jurors. Rather, he testified that he was "positive" that none of the jurors had access to adverse information. Also, the trial court did not testify that he did not see some or one of the jurors at any time during the separation. Rather, he testified that he accompanied all of them during the entire separation. None of these statements were refuted. With these distinctions, *Skillern,* supra, is not strictly applicable to this case.

Because the majority fails to correctly characterize the facts, I dissent to its treatment of this case.

W.C. DAVIS, J., joins.

## OPINION ON STATE'S MOTION FOR REHEARING

MILLER, Judge.

This is a request for rehearing of this Court's opinion (See, page 207). On original submission, this Court held that reversible trial error occurred when the trial court permitted the jury to separate after the charge had been read. See Art. 35.23, V.A. C.C.P. We held that the provisions of Art. 35.23, *id.,* were mandatory, and a presumption of harm attached once appellant established in the record that he had not consented. We then reversed the conviction because the State had failed to rebut this presumption. In its motion for rehearing, the State contends that the record shows that the presumption of harm was rebutted. We will grant the State's motion for rehearing, overrule that point of error concerning the jury separation issue, and address the remaining points of error not disposed of on original submission. We will affirm the conviction.

With regard to appellant's first point of error in which he contends that an impermissible jury separation occurred, we substitute the following for the discussion given in the original opinion.

Article 35.23, supra, gives the trial court the discretion to permit the jurors to separate in a felony case until the charge has been given. Afterward, the jury "shall be kept together" until a verdict is rendered or the jury is discharged, or the separation is given by permission of the trial court with consent of the parties.

■ According to Art. 35.23, supra, reversal of the case is required if, after the charge is given, the jury is allowed to separate without the defendant's consent. See *McDonald v. State,* 597 S.W.2d 365 (Tex. Cr.App.1980), *cert. denied* 449 U.S. 1010,, 101 S.Ct. 564, 66 L.Ed.2d 467 (1980). See also *Skillern v. State,* 559 S.W.2d 828 (Tex. Cr.App.1977) and *Rhynes v. State,* 479 S.W.2d 70 (Tex.Cr.App.1972).

The defendant has the burden to make sure that the record reflects that he did not consent to the separation. *McDonald,* supra, at 367, citing *Green v. State,* 510 S.W.2d 919 (Tex.Cr.App.1974). See also *Taylor v. State,* 636 S.W.2d 600 (Tex. App. 1982). Once the defendant has established in the record that the separation took place without his consent, Art. 35.23, supra, raises a presumption of harm which the State must rebut. *Taylor,* id.; *Reed v. State,* 595 S.W.2d 856 (Tex.Cr.App.1980); *Decker v. State,* 570 S.W.2d 948 (Tex.Cr. App. 1978); *Trevino v. State,* 565 S.W.2d 938 (Tex.Cr.App.1978); *Skillern,* supra; and *Goodall v. State,* 501 S.W.2d 342 (Tex. Cr.App.1973).

In the instant case, appellant raised the issue of an invalid jury separation by his motion for mistrial during the trial on the merits. At the hearing on that motion, he showed that neither he nor his attorneys consented to the separation, nor were they given an opportunity to do so. Thus, on this record, appellant made the required showing under Art. 35.23, supra, and the burden shifted to the State to rebut the presumption of harm.

■ As evidence to rebut this presumption of harm, the record reflects that the trial court judge narrated the following:

1. The trial judge accompanied the jurors as a group from the courthouse to the parking lot.

2. The trial court accompanied the jurors to each of their cars.

3. The trial court saw the jurors move their cars en masse from where they were parked to the courthouse.

4. The trial court was "positive that none of the jurors had access to any information or contact with other persons during this process."

These facts show that the jurors did not make any outside contacts while moving their cars in the presence and view of the trial court.

Thus, under the facts of this case, there is no evidence that the jurors were out of sight of the trial judge, that the jurors had any contact with other persons, nor that appellant was harmed in any way by the separation. *Austin v. State,* 375 S.W.2d 308 (Tex.Cr.App.1964); *Smith v. State,* 124 Tex.Cr.R. 163, 60 S.W.2d 768 (1933). Thus, the State, through the trial judge's "testimony," has met its burden of rebutting the presumption of harm.

Brief pause must be made to distinguish the facts of this case from those presented in *Skillern,* supra, which at first glance may appear similar. In that case, the bailiff and another witness testified that they had not seen the jurors speak to anyone, but clearly stated *they had not had the jurors in sight at all times during the separation.* This Court held that the testimony of a person under these conditions merely to the effect that he did not see a juror speak to anyone in a situation where he did not see the juror at all times, standing alone, constituted no evidence that such speaking *did not occur.* Absent sufficient evidence, the State had failed to sufficiently rebut the presumption of harm.

In the instant case, the trial court did not state that he did not see anyone speak to the jurors. Rather, he "testified" that he was "positive" that none of the jurors had access to adverse information. Also, the trial court did not "testify" that he lost sight of some or one of the jurors at any time during the separation. Rather, he "testified" that he accompanied all of them during the entire separation. None of these statements were refuted. With these

distinctions, *Skillern,* supra, is not strictly applicable to this case.

We therefore find that the State, through the statements of the trial judge, met its burden of refuting the presumption of harm. Appellant's first point of error is overruled.

On original appeal, appellant brought eleven points of error. In our opinion on original submission, this Court sustained appellant's first point of error, but overruled his points of error numbers two through six. We adhere to our original disposition of the latter points of error. Next, we will address the remaining five points of error.

In appellant's seventh and eighth points of error, he contends that the trial court erred by permitting evidence of an inadmissible extraneous offense to be placed before the jury. The record shows that the testimony of Valerie Rencher established that after the murder, appellant and the three others [1] left the scene and drove to Waller. Danny Harris parked the truck, and the three men got out. James Manuel had the gun that was found in the deceased's truck. They left the engine running, and were gone for approximately five minutes. They came back, got into the truck, and left at a high rate of speed.

After this testimony was elicited, appellant's counsel objected on the basis that the facts constituted an inadmissible extraneous offense since:

"It would take not only a blind man but a deaf man not to understand the implication of three people getting out of the truck with a shotgun, and being gone for five minutes, and coming back, driving back to Bryan ninety miles an hour. It's clearly indicative of an extraneous offense."

Appellant's eighth point of error concerns testimony elicited from Barbara Gilmore which appellant contends also contained reference to an inadmissible extraneous offense. The record shows that Gilmore was an assistant manager of a U-Totem convenience store located in Waller.

---

1. Valerie Rencher, Danny Ray Harris [appellant's brother], and James Manuel.

On the night of the murder, December 11, 1978, three men came into the store, one of whom carried a shotgun. At trial, Gilmore identified the shotgun found in the deceased's car as similar to the shotgun carried into the store. No additional facts were related, and Gilmore was excused from the stand.

Later in the trial, the State recalled Gilmore. She identified appellant as one of the men who entered the store on December 11, 1978. When questioned as to her certainty of the identification, Gilmore stated that the men had been in the store approximately fifteen minutes, that on the night they entered the store, appellant had stood an arm's length away from her, and that she would never forget his face.

▮ Initially, evidence of an extraneous offense must necessarily involve evidence of prior criminal conduct. *McKay v. State,* 707 S.W.2d 23 (Tex.Cr.App.1985). If the evidence fails to show that an offense was committed or that the defendant was connected to the offense, then evidence of an extraneous offense is not established. *Id.* See also *Roach v. State,* 586 S.W.2d 866 (Tex.Cr.App.1979), citing *Albrecht v. State,* 486 S.W.2d 97 (Tex.Cr.App.1972).

▮ In the case at bar, the testimony elicited from Rencher shows, at most, that Danny Harris committed the offense of driving at a speed in excess of the established speed limit. Since appellant was not operating the vehicle at the time, he was not connected with that particular offense. Thus, Rencher's testimony contained no reference to an inadmissible extraneous offense.

▮ Gilmore's testimony shows that at most, appellant accompanied two other men into the store, one of whom carried a shotgun. There was absolutely no mention of a robbery. Since appellant did not carry the shotgun, he was not connected with a specific offense. Thus, no inadmissible extraneous offense was introduced.

▮ In his brief, appellant contends that the preceding evidence leads to the inescapable conclusion that a robbery was committed. We note that while there was certainly no clear evidence that appellant robbed Gilmore after he and the others entered the store, the invitation for the jury to speculate as to the occurrence of a robbery is quite tempting.

Even if we speculate, however, that the jury may have deduced from the preceding facts that a robbery had occurred, we find that admission of such an offense was supported by the record. Initially, evidence of an extraneous offense is admissible if the transaction is relevant to a material issue in the case, and also, if the relevancy value of the evidence outweighs its prejudicial effect. *Williams v. State,* 662 S.W.2d 344 (Tex.Cr.App.1983).

In the case before us, the testimony elicited from the two witnesses was relevant since it connected appellant, at a point very close in time to the commission of the offense, with the shotgun, which had been taken from the deceased's truck, and with the other perpetrators of the offense. Also, no overt references were made to a robbery, that is, the State did not overkill and proffered only enough evidence to establish this relevancy. The trial court also gave extensive limiting instructions regarding extraneous offenses.

In the case at bar, appellant and the other two men murdered the deceased, and were seen in the store with the deceased's shotgun only two hours after the murder. We find that the probative value of the facts regarding appellant's entry into the store was greater than any prejudicial effect. Thus, the trial court did not err by admitting the evidence. Appellant's seventh and eighth points of error are overruled.

In his ninth point of error, appellant contends that there was insufficient evidence to support the jury's affirmative response to Special Issue Number 2, regarding whether appellant would constitute a continuing threat of violence to society. See Art. 37.071(b)(2), V.A.C.C.P. In order to address this issue, we must summarize the evidence presented by the State at the punishment phase of trial.

The State called several witnesses who testified that appellant's reputation for being peaceful and law-abiding was bad. The State then called Gilmore back to the stand. She testified as to the specific facts concerning the night appellant and the others entered the store.

She testified that at approximately eleven o'clock in the evening on December 11, 1978, she was stocking the beer cases. Three men entered the store, one of whom was armed with a shotgun. When they entered the store, the armed man told her to "get the money." He then shoved her behind the counter. After Gilmore opened the cash register, appellant grabbed the money. Appellant also took a change bottle which contained donations for the Multiple Sclerosis Society. The armed man then hit her in the face with the gun, and reached over and took a gun that was under the register counter. Appellant then watched at the door to the store to see that no one was coming, while the armed man stole other items in the store. After the robbery, the men left.

The facts of the offense are also relevant to the jury's finding on the second punishment issue. *DeGarmo v. State*, 691 S.W.2d 657 (Tex.Cr.App.1985), at 661, citing *Branch v. State*, 445 S.W.2d 756 (Tex. Cr.App.1969). Although the facts of the offense have already been set forth in the original opinion, we will repeat the facts relevant to this point of error.

The record shows that on the night of the offense, appellant, two other men, and Rencher [appellant's girlfriend] were driving around in a car. They went to a friends's house, and Rencher got our of the car and knocked on the door. When no one answered, she returned to the car. Danny Harris could not start the car. Appellant and the other men then began tearing up the interior of the car, and kicking and cursing the car. As the four walked away from the stalled car, Danny Harris flagged down a truck, stopped the driver, and asked if he had any booster cables. The driver, soon to be the deceased, pulled his truck in front of the stalled car and got his cables out. They attempted to start the car but were unsuccessful. The deceased said that the car was not going to start and suggested that the others seek help elsewhere. As the deceased was attempting to remove the cables, Danny Harris said "We're going to drive this man." Appellant then went around to the back of the truck with a tire jack. Danny Harris pushed the man to the ground, and pinned him down. Appellant then hit the deceased with the tire jack at least six times. Several of the strikes were described as "real hard." After appellant stopped hitting the deceased, James Manuel went and took the deceased's wallet. The men left the deceased in a ditch, got into the truck, where Rencher was already seated, and found the deceased's shotgun. They drove to appellant's parents' house. On the way, they discussed getting rid of the tire jack. James Manuel stated that he needed some money.

After they arrived at the house, and changed clothes, they got back into the truck, drove toward Navasota, and ended up in Waller. They then committed the robbery at the U-Totem, as described by witness Gilmore. Later, they disposed of the deceased's truck.

██ When considering the sufficiency of evidence presented to support a jury's finding that a defendant will constitute a continuing threat to society, each case must be decided on its own facts. *Santana v. State*, 714 S.W.2d 1 (Tex.Cr.App. 1986), at 8, citing *Cannon v. State*, 691 S.W.2d 664 (Tex.Cr.App.1985). In some instances, the facts of the offense itself will support an affirmative finding, *Santana*, supra, and certainly those circumstances may provide greater probative evidence than any other evidence presented at the punishment phase of trial. *Kunkle v. State* (Tex.Cr.App. No. 69,501, delivered June 18, 1986), and *Fierro v. State*, 706 S.W.2d 310 (Tex.Cr.App.1986). In other cases, the facts presented at both phases of trial are considered together. See *Goodman v. State*, 701 S.W.2d 850 (Tex.Cr.App. 1985).

When we view the facts, we must evaluate the evidence in the light most favorable

to the verdict and determine whether any rational trier of fact could have made the finding beyond a reasonable doubt. *Kunkle,* supra, and *Fierro,* supra.

▪ In the case before us, it is clear that the murder was totally unprovoked, c.f., *Horne v. State,* 607 S.W.2d 556 (Tex.Cr.App.1980), *Warren v. State,* 562 S.W.2d 474 (Tex.Cr.App.1978). Rather, appellant and the others preyed upon the good intentions of a person who had stopped to help them. Appellant murdered the deceased in a violent and brutal way, c.f. *Roney v. State,* 632 S.W.2d 598 (Tex.Cr.App.1982), *Horne,* supra, and *Warren,* supra, similar to the facts presented in *Kunkle,* supra. Then, after leaving the body of the deceased in a ditch, appellant and the others committed an armed robbery, which resulted in physical injury to the victim robbed. We find that on the facts presented at both the guilt and punishment stages of trial, that a rational trier of fact could have found beyond a reasonable doubt that appellant would constitute a continuing threat of violence to society. Cf. *Keeton v. State,* 724 S.W.2d 58 (Tex.Cr.App.1987). Appellant's ninth point of error is overruled.

In his last two points of error, appellant contends that the trial court erred in excusing two prospective jurors who were never sworn by the trial court prior to voir dire examination. Appellant made no objection on this issue at the time the two prospective jurors were examined during voir dire. Also, prior to trial, appellant's counsel stated that he had no objections to the jury list.

There is nothing in the record to show affirmatively that they were not sworn. Rather, the record shows that the jury panel was sworn as a group, and is silent as to whether the two specific prospective jurors were sworn.

In *Clay v. State,* 505 S.W.2d 882 (Tex.Cr.App.1974), at 884–5, this Court stated:

"This Court must presume the jury was properly empaneled and sworn, unless such matter was made an issue in the

trial court, or it otherwise affirmatively appears to the contrary from the record. Article 44.24, V.A.C.C.P.[2] We find no objection by appellants in the record to a failure to administer the oath to the jury panel. They raise the point for the first time on appeal. Moreover, the record does not affirmatively show that the oath required by Article 35.02, V.A.C.C.P. was not given. This ground presents no error and is overruled."

"Appellant made no objection to the proceedings or the jurors at any time during the course of the trial. Neither does the record in this cause affirmatively reflect that the prospective jurors were not properly sworn before each was examined during the voir dire; the record is silent on this matter. Therefore, the statute [Art. 44.24(a), V.A.C.C.P.] mandates a presumption that the jury in the instant case was properly impaneled."

▪ In the instant case, appellant made no objection to the failure of the trial court to swear in any prospective jurors. Moreover, the record is silent on the matter as to the two specific jurors mentioned in appellant's point of error. The record does reflect that the jury was sworn in as a group. Based upon this record, we find that the presumption that the jurors were sworn applies to the instant case. Appellant's tenth and eleventh points of error are overruled.

The State's motion for rehearing is granted, and finding no reversible error, we affirm the judgment of the trial court.

DUNCAN, J., concurs in the result.

CLINTON, J., dissents.

ONION, Presiding Judge, concurring on State's Motion for Rehearing.

The opinion on original submission should be withdrawn. After further study and reflection, I agree that no reversible error is presented by the jury separation question. I reach this conclusion, however,

---

**2.** Article 44.24, supra, was repealed, effective September 1, 1986, and was carried forward as Texas Rule of Appellate Procedure 80(d).

Similarly, in *Duffy v. State,* 567 S.W.2d 197 (Tex.Cr.App.1978), the Court stated at 200:

on a different basis than the majority on rehearing.

Article 35.23, V.A.C.C.P., gives the trial court the discretion to permit the jurors to separate in a felony case *until* the court has given its charge to the jury. After receiving the charge, the jury "shall be kept together" until a verdict is rendered or until the jury is finally discharged. Once the charge is given, Article 35.23, supra, allows the jury to separate only by permission of the court *and* with the consent of the parties.[1]

The provisions of Article 35.23, supra, are mandatory. *Green v. State*, 510 S.W.2d 919 (Tex.Cr.App.1974); *Goodall v. State*, 501 S.W.2d 342, 343 (Tex.Cr.App. 1973); *Wells v. State*, 634 S.W.2d 868, 870 (Tex.App.—Houston [1st Dist.] 1982) pet. ref'd.

The statute requires reversal if the jury is allowed to separate after the court's charge has been given unless the defendant consents. *McDonald v. State*, 597 S.W.2d 365, 367 (Tex.Cr.App.1980), *cert. den.* 449 U.S. 1010, 101 S.Ct. 564, 66 L.Ed.2d 467 (1980); *Skillern v. State*, 559 S.W.2d 828 (Tex.Cr.App.1977). See also *Rhynes v. State*, 479 S.W.2d 70 (Tex.Cr. App.1972).

It is the defendant's burden to insure that the record shows that he or she did not consent to the separation. *McDonald v. State*, supra, at 367; *Green v. State*, supra; *Burgett v. State*, 646 S.W.2d 615, 619 (Tex.App.–Fort Worth 1983); *Taylor v. State*, 636 S.W.2d 600 (Tex.App.—El Paso 1982). "Where the defendant has established in the record that a separation occurred without his consent, the mandatory language of Article 35.23 raises a presump-

tion of harm which the State must then seek to rebut." *Taylor v. State*, 636 S.W.2d, supra, at 602. See also *Reed v. State*, 595 S.W.2d 856, 857 (Tex.Cr.App. 1980); *Goodall v. State*, 501 S.W.2d 342, 343 (Tex.Cr.App.1973); *Decker v. State*, 570 S.W.2d 948, 950, n. 7 (Tex.Cr.App. 1978); *Trevino v. State*, 565 S.W.2d 938, 940 (Tex.Cr.App.1978); *Skillern v. State*, supra.

In order to afford the State an opportunity to rebut this presumption of harm, the issue of improper jury separation must be raised during trial or in a motion for new trial. *Green v. State*, supra, at 922; *McDonald v. State*, supra, at 367; *McIlveen v. State*, 559 S.W.2d 815, 818–819, n. 1 (Tex. Cr.App.1977); *Taylor v. State*, supra, at 602.

After the charge was given to the jury in the instant case and the opening arguments of the State and defense at the guilt stage of the trial had been completed, the court declared a recess telling the jury to go to the jury room. It appears that during this recess the claimed separation took place. Immediately after the recess the record reflects:

"THE COURT: Are y'all ready?

"MR. PRICE (Defense Counsel): At this time, Curtis Paul Harris, the defendant in Cause Number 16,430 moves for a mistrial for reason that the jurors have separated in violation of 3523, The Code of Criminal Procedure; there having been no waiver of separation provision.

"THE COURT: Emphatically denied. The Court was in attendance with the jurors just for convenience for the ladies who are members of this jury. So when they leave tonight, the Courthouse to

---

1. Article 35.23, V.A.C.C.P. (Jurors May Separate), reads:

   "The court may adjourn veniremen to any day of the term. When jurors have been sworn in a felony case, the court may, at its discretion, permit the jurors to separate until the court has given its charge to the jury, after which the jury shall be kept together, and not permitted to separate except to the extent of housing female jurors separate and apart from male jurors, until a verdict has been rendered or the jury finally discharged, unless by permission of the court with the consent of

each party. Any person who makes known to the jury which party did not consent to separation shall be punished for contempt of court. If such jurors are kept overnight, facilities shall be provided for female jurors separate and apart from the facilities provided for male jurors. In misdemeanor cases the court may, at its discretion, permit the jurors to separate at any time before the verdict. In any case in which the jury is permitted to separate, the court shall first give the jurors proper instructions with regard to their conduct as jurors when so separated."

journey to the motel, they didn't have to walk to a dark parking lot and pick up their vehicles. So, the Court instructed them to go there, proceeded with them to the lot, and brought the cars back here. So, your motion is overruled.

"MR. PRICE: Further, your Honor, for the record, please, may the record reflect that the Court is not the officer in charge of the jurors.

"THE COURT: Whatever, your motion is emphatically denied." [2]

Appellant made the jury separation one of the grounds set forth in his motion for new trial, alleging his lack of consent.

Appellant testified that he had not consented to the jury separation nor had he been given an opportunity to consent or not to consent to the separation. The State did not cross-examine. Appellant's counsel, Michael McDougal, testified:

"As far—I'll just reiterate what I just said and make that my testimony that I was never given the opportunity to consent or not consent to their being allowed to separate and leave the courtroom, for any purpose, whether it was to move their cars late at night or not. And, we did not consent to that. And I think Mr. Price (defense counsel) has already made his statement back when it happened."

The record then reflects:

"THE COURT: And the Court made itself perfectly clear at that time, and went on the record at that time, and will go on the record for purpose of the Motion for a New Trial, at this time, in saying that I accompanied the jurors to— from the Courthouse to the County parking lot, especially the Court being concerned, at that time, with lady-jurors, who did—would have to walk during the night to their cars after we finished that night. And the court being concerned for the welfare of the lady-jurors, as well as the jurors in general, accompanied the jurors to the County parking lot, saw them to their cars, and the return of the cars to parking under the Courthouse

and return here as a group. And the Court is positive that none of the jurors had access to any information or contact with other persons during this process.

"MR. McDOUGAL: Did the Court ride in the cars with each of them?

"THE COURT: That's a mathematical impossibility, as counsel well knows.

"MR. McDOUGAL: Is the Court aware of whether or not any of the jurors listened to their radios on their way back to the Courthouse?

"THE COURT: No, the Court's not aware of that.

"MR. McDOUGAL: Is the Court aware of where the gentlemen, men-jurors, were when the ladies were moving their cars?

"THE COURT: Yes, they were moving their cars, too. ·

"MR. McDOUGAL: You didn't—the Court did not go with the men to move their cars? They accompanied—

"THE COURT: The Court accompanied all of them down there.

"MR. McDOUGAL: To each of their cars?

"THE COURT: Yes.

"MR. McDOUGAL: They were all parked in the same place?

"THE COURT: Yes, in the County parking lot.

"MR. McDOUGAL: All twelve jurors?

"THE COURT: Were parked in the County parking lot, except, I think, Thomas Vittrup, his was not there. He parked over in his Dad's—about a block from here, but they all individually drove their cars back over here. Anyway, ground thirty-two is denied ground thirty-three is denied, ground thirty-four is denied, ground thirty-five is denied.... All right. Be denied and thirty-six is denied.

"MR. BRYAN (Prosecutor): Your Honor, could we have ... as to the separation of ... that was late in the evening? ...

---

2. It does not appear that the parties were notified of the moving of the vehicles by the jurors

nor was their consent sought.

"MR. BRYAN: It was late in the evening?

"THE COURT: Yes, it was late in the evening.

"MR. BRYAN: After working hours?

"THE COURT: After normal working hours, it certainly was. We agreed to stay late that night.

"Ground thirty-seven is denied. Okay, Curtis, would you stand?"

No other effort was made by the appellant or the State to show the circumstances under which the claimed separation took place. The jurors were not called, although juror Vittrup was an earlier witness at the hearing on the motion for new trial on a different ground.

As earlier noted, it was clearly the burden of the appellant to establish (1) that a separation as contemplated by Article 35.-23, supra, took place, and (2) that he did not consent to such separation. From the record it appears that appellant clearly established that he and his counsel had not consented to any separation but, outside the later statements of the trial judge, it was not established by appellant that a separation did in fact take place. Thus the burden did not shift to the State to rebut any presumption of harm.

Immediately after the appellant had offered evidence as to his lack of consent the trial judge, sua sponte, began narrating facts into the record concerning the jury "separation," the moving of the vehicles and his role as jury shepherd. Thereafter there was a colloquy including questions and answers and other volunteered statements by the judge. It is to be observed that the trial judge was never called as a witness by either the State or the appellant nor does the record show that the judge was sworn.

Article 38.13, V.A.C.C.P., in effect at the time of appellant's trial, reads:

"The trial judge is a competent witness for either the State or the accused, and may be sworn by the clerk of his court and examined, but he is not required to testify if he declares that there is no fact within his knowledge important in the case."

The remarks and statements of the trial judge are not evidence. *Benson v. State*, 44 S.W. 168 (Tex.Cr.App.1898); *Plumlee v. State*, 293 S.W. 1108, 1109 (Tex.Cr.App. 1927). A judge presiding may testify as a witness in the case, but to be eligible to do so he must be sworn as any other witness. *Wilcox v. State*, 146 Tex.Cr.R. 443, 176 S.W.2d 186, 187 (1943); *Valentine v. State*, 6 Tex.App. 439 (1879).

In *Great Liberty Life Insurance Company v. Flint*, 336 S.W.2d 434 (Tex.Civ. App.—Ft. Worth 1960), a civil case, the record shows that trial the judge, who was hearing the motion for new trial, said: "Let the record show that the court did not talk to anybody on that date about the case." The Court of Appeals wrote:

"We think appellant's motion for new trial should have been granted. If we could consider Judge Young's statement as testimony in the case a different situation would be presented. But we do not think his statement can be so considered. It is well settled that the Judge presiding at a trial may become a witness in the case. 44 Tex.Jur. p. 991, Sec. 45. 'However, in assuming the role of a witness he must do so in accordance with the same rules of procedure that apply to any other witness; namely, to be sworn in the manner and form as required by law, unless such oath be waived by the parties, and be examined and re-examined by the parties to the suit touching his knowledge of the matters in reference to which he may testify.' *Conyer v. Burckhalter*, Tex.Civ.App., 275 S.W. 606, 613, reversed on other grounds, *Burckhalter v. Conyer*, Tex.Com.App., 9 S.W.2d 1029."

In *Duvall v. Sadler*, 711 S.W.2d 369, 375 (Tex.App.-Texarkana 1986) (no writ hist.), it was held that the testimony of the judge presiding at the trial may not be considered by the reviewing court as probative evidence going to the merits of the case in light of Rule 605 of the Texas Rules of Evidence, adopted by the Supreme Court of Texas effective September 1, 1983. Said rule provides that the judge presiding at the trial may not testify in that trial as a

witness and that no objection need be made in order to preserve the point. *Duvall* made clear that Rule 605 was taken from Federal Rules of Evidence, Rule 605, which was identical in wording, and which had been described as a broad rule of incompetency.[3]

Texas Rules of Criminal Evidence, Rule 605 (Competency of Judge as Witness) (effective Sept. 1, 1986), also provides:

"The judge presiding at the trial may not testify in that trial as a witness. No objection need be made in order to preserve the point."

Conceding that the above rule adopted by this Court was not in effect at the time of the hearing on the motion for new trial, and conceding the rule in a civil case was not necessarily applicable, the statements and remarks of the trial judge were not evidence in this criminal case. *Plumlee v. State,* supra; *Benson v. State,* supra. Reliance therefore by the appellant upon such statements to show a jury separation is misplaced. Without such evidence the burden never shifted to the State to rebut the presumption of harm, and the court did not err in overruling the motion for new trial on this ground.

Even if it can be argued that although the judge was an unsworn witness, called neither by the State nor the appellant, the failure to object waived any statutory requirements, see and cf. *Beck v. State,* 719 S.W.2d 205 (Tex.Cr.App.1986), and that the statements were evidence, then it appears that the evidence was not sufficient to show a jury separation as contemplated by the statute and amounting to reversible error. See Tex.Jur.3rd, Vol. 23, Criminal Law, § 2739, pp. 394–396.

The majority finds that "the State, through the statements of the trial judge, met its burden of refuting the presumption of harm." Since the presumption of harm was never raised, I do not agree with the majority for the reasons set forth above. I do, however, concur in the result reached.[4]

TEAGUE, Judge, dissenting.

On original submission, in a 6–3 decision by this Court, in what might be described as an opinion that was unpopular with the masses, this Court, speaking through its Presiding Judge, reversed the trial court's judgment and sentence because "the trial court erred in allowing the jurors in this death penalty case to separate after the charge was given at the guilt stage of the trial, and before a verdict was reached," and because the State did not rebut the presumption of harm the conviction had to be reversed. Today, however, a majority of this Court, on State's motion for rehearing, speaking through Judge Miller, does a complete flip-flop, and holds that the State, "through the trial judge's 'testimony,' has

---

**3.** In *Duvall* the court noted that the notes of the Federal Advisory Committee on Proposed Rules stated in part as to Fed.R.Evid. 605:

"The solution here presented is a broad rule of incompetency only as to material matters, leaving the matter to the discretion of the judge, or recognizing no incompetency. The choice is the result of inability to evolve satisfactory answers to questions which arise when the judge abandons the bench for the witness stand. Who rules on objections? Who compels him to answer? Can he rule impartially on the weight and admissibility of his own testimony? Can he be impeached or cross-examined effectively? Can he, in a jury trial, avoid conferring his seal of approval on one side in the eyes of the jury? Can he, in a bench trial, avoid an involvement destructive of impartiality?"

**4.** Any trial judge is ill-advised to assume the role of jury shepherd, even for noble purposes. A judge is prohibited from commenting upon the weight of the evidence or from making any remark or conducting himself in any way calculated to convey to the jury his opinion of the cases. *McClory v. State,* 510 S.W.2d 932 (Tex. Cr.App.1974); *Hay v. State,* 472 S.W.2d 157 (Tex.Cr.App.1971). See Article 38.05, V.A.C.C.P.

Article 36.24, V.A.C.C.P., provides:

"The sheriff of the county shall furnish the court with a bailiff during the trial of any case to attend the wants of the jury and to act under the direction of the court. If the person furnished by the sheriff is to be called as a witness in the case he may not serve as bailiff."

The record in the instant case is silent as to why a bailiff was not available to act as jury shepherd.

Trial judges can avoid error if consent from the parties is first obtained before the jurors are permitted any action which might constitute a separation. See *Jones v. State,* 47 Tex.Cr.R. 161, 83 S.W. 198 (1904).

met its burden of rebutting the presumption of harm." (Page 211 of majority opinion.) Without a doubt, this opinion will probably become popular with the masses, notwithstanding the fact that it causes this Court to lose some of its judicial independence. Cf., however, *Woodward v. State*, 668 S.W.2d 337 (Tex.Cr.App.1982).

I observe that Presiding Judge Onion, the author of the original majority opinion, has filed a concurring opinion in which he asserts that without the trial judge's statements appellant did not establish that the jurors had separated. Judge Onion asserts that appellant may not rely upon the trial judge's unsworn statements that he made in open court because "A judge presiding may testify as a witness in the case, but to be eligible to do so he must be sworn as any other witness." Judge Onion lastly concludes that because the trial judge in this cause had not been sworn prior to making his statements into the record "the burden did not shift to the State to rebut any presumption of harm." (Page 6 of Presiding Judge Onion's concurring slip opinion.) In response to Presiding Judge Onion's conclusion that what the trial judge stated into the record is no evidence because he was not then sworn as a witness, I must point out that just recently, in *Canada v. State*, 660 S.W.2d 528, 530 (Tex.Cr. App.1983), this Court held that unsworn statements of a prosecuting attorney were sufficient to place the event in the record. Also see *Hicks v. State*, 525 S.W.2d 177 (Tex.Cr.App.1975), in which this Court held that unsworn statements by one of the defendant's attorneys were sufficient to place the event in the record. I find that to hold that in such a situation as occurred here that before a trial judge's words can be treated "as placing the event in the record" he must be sworn is an affront to the judiciary of this State. I, therefore, totally and wholly disassociate myself with what Presiding Judge Onion has stated. Furthermore, I urge the reader to read Presiding Judge Onion's opinion for the Court in *Beck v. State*, 719 S.W.2d 205 (Tex.Cr.App.1986), in which it was held that

if a defendant failed to timely object to unsworn testimony of a fingerprint expert he waived any claim that such testimony was not properly admitted. A good rule of law still works both ways, doesn't it? Given the record before us, it is obvious to me that everyone, including the trial judge, treated his testimony as the equivalent of sworn testimony, and to say otherwise blinks reality in the eye.

The record reflects that after one of appellant's counsel had concluded his closing argument at the guilt stage of the trial, but before his co-counsel argued, the trial judge stated the following into the record: "Let's take a break. [Obviously referring to the jurors:] Go to the jury room first, okay?"[1] Thereafter, one of appellant's counsel moved for a mistrial "for the reason that the jurors have separated in violation of 3523 [sic], the Code of Criminal Procedure; there having been no waiver of separation provision." In response to the motion, the trial judge stated the following: "Emphatically denied. The Court was in attendance with the jurors just for convenience for the ladies who are members of this jury. So when they leave tonight, the Courthouse to journey to the motel, they didn't have to walk to a dark parking lot and pick up their vehicles. So, the Court instructed them to go there, proceeded with them to the lot, and brought the cars back here. So, your motion is overruled." Counsel for appellant then stated: "[M]ay the record reflect that the Court is not the officer in charge of the jurors." The trial judge responded: "Whatever, your motion is emphatically denied." Counsel: "Thank you, your Honor." The Court: "Are you ready to proceed?" Counsel: "Yes, your Honor." Thereafter, co-counsel made his final closing argument on behalf of appellant. (Vol. 95, pages 1426–1428).

During the hearing on appellant's motion for new trial, counsel for appellant who had moved for the mistrial stated to the trial judge: "Your Honor, I need to call [appellant], with respect [to his contention regarding the jurors separating without his consent]. THE COURT: Okay. [Counsel]:

---

1. The record does not reflect how long "the break" lasted.

And myself. THE COURT: Okay. Just stay right there if you want to—the clerk will swear both of you in." The record then reflects the following: "(Defendant and Defendant's counsel sworn in.)" Appellant himself thereafter testified that he did not consent to the jurors separating when they did. When appellant was asked whether he had been given the opportunity to consent or not consent to the jurors separating, the trial judge interrupted and stated the following: "Don't you [obviously referring to counsel][2] recall, it was late in the evening; we had jurors that had their cars down on the County parking lot; that the Court went with these jurors to their cars; accompanied them together?" Counsel responded: "Could I just ask my questions and have him testify—THE COURT: Well, the Court's just requesting that you state it correctly, not where it's self-serving, counsel. COUNSEL: Well, the whole thing is, we didn't consent to their being separated, or being excused for any purpose, whether it was late in the evening or not, whether they had to move their cars or not. That's the whole point of the Motion. If the Court feels that that is correct, then I don't object to the Court's putting that in the record; but as far as my testimony and the defendant's testimony goes, I would like the record to affirmatively show that we did not consent to their being allowed to do that, nor were we given the opportunity to either consent or not consent to their being allowed to do that.[3] THE COURT: Go right ahead. It's all self-serving on your part, anyway." Appellant himself then testified that he did not consent to the jurors separating when they did, and also testified that he was never asked whether he would consent to the separation. The prosecuting attorney did not ask appellant any questions. At this time, counsel for appellant stated: "As far—I'll just reiterate what I just said and make that my testimony, that I was never given the opportunity to consent or not consent to their being allowed to separate and leave the

courtroom, for any purpose, whether it was to move their cars late at night or not. And, we did not consent to that. And I think Mr. Price [co-counsel] has already made his statement back when it happened. THE COURT: And the Court made itself perfectly clear at that time, and went on the record at that time, and will go on the record for purpose of the Motion for a New Trial, at this time, in saying that I accompanied the jurors to—from the Courthouse to the County parking lot, especially the Court being concerned, at that time, with lady-jurors, who did—would have to walk during the night to their cars after we finished that night. And the Court being concerned for the welfare of the lady-jurors, as well as the jurors in general, accompanied the jurors to the County parking lot, saw them to their cars, and *the return of the cars to parking under the courthouse*[4] and return here as a group. And the Court is positive that none of the jurors had access to any information or contact with other persons during this process. [Counsel for appellant]: Did the Court ride in the cars with each of them? THE COURT: That's a mathematical impossibility, as counsel well knows. [Counsel]: Is the Court aware of whether or not any of the jurors listened to their radios on their way back to the Courthouse? THE COURT: No, the Court's not aware of that. [Counsel]: Is the Court aware of where the gentlemen, men-jurors were when the ladies were moving their cars? THE COURT: Yes. They were moving their cars, too. [Counsel]: You didn't—the Court did not go with the men to move their cars? They accompanied—THE COURT: The Court accompanied all of them down there. [Counsel]: To each of their cars? THE COURT: Yes. [Counsel]: They were all parked in the same place? THE COURT: Yes, in the County parking lot. [Counsel]: All twelve jurors? THE COURT: Were parked in the County parking lot, except, I think, Thomas Vittrup, his

2. I make this statement based upon the fact that because appellant had previously been assessed the death penalty, he surely did not accompany the trial judge to the parking lot.

3. Please note that when counsel made these statements, he had previously been sworn.

4. Emphasis added.

was not there. He parked over in his Dad's—about a block from here, but they all individually drove their cars back over here. Anyway, ground thirty-two is denied, ground thirty-three is denied, ground thirty-four is denied, ground thirty-five is denied. [Counsel]: I reurge that the testimony of the juror, Thomas Vittrup, (fall in) thirty-five, your Honor. THE COURT: All right. Be denied and thirty-six is denied. [Counsel]: Thirty-seven? MR. BRYAN (The prosecuting attorney): Your Honor, could we have—as to the separation of—that was late in the evening. THE COURT: And thirty—THE COURT: Yes. [Counsel for appellant]: What? MR. BRYAN: It was late in the evening. THE COURT: Yes, it was late in the evening. MR. BRYAN: After working hours? THE COURT: After normal working hours, it certainly was. We agreed to stay late that night. Ground thirty-seven is denied." (Volume 97, pages 18–29, inclusive).

Prior to the enactment of Art. 35.23, V.A.C.C.P., once jurors were sworn, they had to be kept together and not permitted to separate until a verdict had been rendered or the jury finally discharged, unless by permission of the court, with the consent of each party and in charge of an officer. See Art. 623, 1925 Code of Criminal Procedure. Now, however, it is only when the charge to the jury has been given that it is mandatory that the jury must be kept together and not permitted to separate except to the extent of housing female jurors separate and apart from male jurors. With this exception, the jurors cannot separate from each other until a verdict has been rendered or the jury finally discharged, *unless the separation occurs with the consent and permission of the trial judge and each party.* See Art. 35.23, V.A.C.C.

The majority opinion correctly holds that appellant clearly established a violation of the statute because he did not personally consent to the separation of the jurors. "[T]he burden [then] shifted to the State to rebut the presumption of harm." (Page 2 of majority slip opinion.)

It is at this point that I must part company with Judge Miller, the author of the majority opinion.

It is obviously clear from this record that what happened is that the trial judge, believing that the area around the Montgomery County Courthouse had become a "high crime" area, was concerned about the safety of the jurors. And there is nothing wrong with this type concern; in fact, it is highly commendable and should be applauded. It speaks well for an outstanding member of our trial judiciary. The problem though is that in his concern about the safety and welfare of the jurors the trial judge apparently, but probably inadvertently, forgot about the provisions of Art. 35.23, supra. When it was brought to his attention that the provisions had not been complied with, the record makes it obviously clear that he then became irked at counsel for appellant invoking what to him was probably a mere and true "technicality" in our law. Whether one wishes to characterize unlawful jury separation as a "technicality" or not makes no difference; it is nevertheless the law and will remain the law until changed by the Legislature.

Did the State overcome the presumption of harm that occurred through the unlawful separation of the jurors? The majority opinion says it did through the "testimony" of the trial judge. I disagree.

It is clear that in this instance the trial judge, acting as the unofficial jury shepherd accompanied the jurors as a group from the courtroom to the County parking lot, where he stationed himself thereon and watched the jurors go in the direction where their respective vehicles were parked. From this record, it is obvious to me that from this point until all of the jurors reassembled in the courtroom, we are not apprised as to what took place with each juror during the interim. Although it would have been an easy thing to do, the State did not seek to have each of the jurors testify. When it is not shown that an individual has another individual in sight at all times, it is difficult, if not impossible, for me to understand how the first individual can unequivocally state that

the other individual had no communication whatsoever with another individual. In this instance, the trial judge never accounted for the activities of the jurors from the moment he saw the jurors head in the direction of their vehicles until they reassembled either at or in the courthouse. To say and hold to the contrary is simply to blink reality in the eye and to give meaning to something that does not exist. Again, the only way that the State could have rebutted the presumption of harm in this instance would have been to have had each of the jurors testify at the hearing on appellant's motion for new trial. For reasons not reflected in this record, the prosecuting attorney chose not to call any of the jurors to testify on this issue, notwithstanding that one of the jurors actually testified on another issue. "It may have been relatively easy to rebut the presumption of harm ..., but no effort was made by the State to call the jurors ... to rebut that presumption [at] the hearing on [the] motion for new trial." *Skillern v. State,* 559 S.W.2d 828, 833 (Tex.Cr.App.1977) (Onion, Presiding Judge, concurring opinion.)

The facts before us and the facts that were before this Court in *Skillern,* supra, are indistinguishable. Again, even relying upon the trial judge's testimony, there is nothing in this record to reflect or indicate that from the moment the jurors left the courtroom until they returned either to the courthouse or the courtroom the trial judge could unequivocally state that no juror during the interim was not subject to any outside influences. In *Skillern,* supra, one witness testified that he did not see any of the jurors speak to anyone. The bailiff also testified that he did not see any of the jurors speak to anyone. Nevertheless, and understandably, because they were not present at all times with the jurors during their absence, the witnesses could not state that the jurors did not have any contacts with outside persons. This Court in *Skillern,* supra, before reversing those death penalty convictions, stated: "Testimony by a person not proven to have had a juror within his sight at all times during a separation merely to the effect that *he did not see* a juror speak to anyone is analogous to testimony by a juror that *he did not hear* certain misconduct in the jury room. Such 'did not hear' testimony of a juror as to misconduct, standing alone, has been held by this Court to constitute 'no evidence' that such did not occur. (Citations omitted.)" (830).

Given what is before us in the record of appeal, to attempt to distinguish what occurred in *Skillern,* supra, with the following statements is ludicrous: "In the instant case, the trial court did not state that he did not see anyone speak to the jurors. Rather, he 'testified' that he was 'positive' that none of the jurors had access to adverse information. Also, the trial court did not 'testify' that he lost sight of some or one of the jurors at any time during the separation. Rather, he 'testified' that he accompanied all of them during the entire separation. None of these statements were refuted ..." The main flaw that I find in Judge Miller relying upon these statements in order to hold that the presumption of harm was rebutted lies in this question that cannot be answered: If it is true that the trial judge accompanied all of the jurors to the County parking lot and thereafter, while standing on terra firma, observed each of them get into his or her respective vehicle and then observed each of them, including the one who parked his vehicle at another location, get inside of their vehicles and drive their vehicles "under the courthouse," how is it humanly possible for the trial judge to have seen what occurred after the jurors drove their respective vehicles "under the courthouse"? (See Vol. 97, at page 24–25, where the trial judge stated that he saw "the return of the cars to parking under the courthouse and return here [obviously referring to the courtroom] as a group.")

Without more than what is in this record, it is impossible to unequivocally state that at all times there was noninterference with all of the members of the jury by someone outside their number. The State has simply failed to rebut the presumption of harm.

It should be easily recognizable by all that the majority opinion's holding will un-

doubtedly be popular with the prosecuting attorney, the trial judge, the jurors, and probably a majority of the citizens of Montgomery and Brazos Counties who happen to be familiar with this case. Our decisions, however, should never rest on what might be popular with the masses: "[W]e do not decide cases on the basis of what decision we might make would be the most popular one, for if we did we would shortly cease to exist as an independent judiciary, which we are, and also cease to exist as an equal to the executive and legislative branches of our state government, which we are." *Pierson v. State*, 614 S.W.2d 102, 109 (Tex.Cr.App.1981) (Teague, J., concurring opinion.) Because I, for one, am not ready to strip this Court of being an independent body politic of our State Government and thus put this Court on the road to being simply a Court that hands down popular decisions that might be acceptable to the masses, I respectfully dissent to the majority opinion's holding that the State overcame the presumption of harm that was established by appellant. It is only by a distorted reading of this record that it can be said that it did, which I decline to do.