

# COURT OF APPEALS
### SECOND DISTRICT OF TEXAS
### FORT WORTH

## NO. 2-08-148-CR

DANIEL ERIC ROOF                                                           APPELLANT

V.

THE STATE OF TEXAS                                                              STATE

------------

### FROM THE 355TH DISTRICT COURT OF HOOD COUNTY

------------

## MEMORANDUM OPINION[1]

------------

A jury convicted Appellant Daniel Eric Roof of engaging in organized criminal activity and aggravated assault with a deadly weapon. The jury assessed punishment at ninety-nine years' confinement for engaging in organized criminal activity and twenty years' confinement for aggravated assault. The trial court then sentenced him accordingly, with the sentences to

---

[1] *See* Tex. R. App. P. 47.4.

run concurrently. In three issues, Appellant argues that (1) the trial court abused its discretion and violated his rights to due process of law, compulsory process, and a fair trial under both the state and federal constitutions by refusing to grant a necessary and proper continuance; (2) the trial court abused its discretion in failing to grant the requested accomplice witness instruction for Jennifer Gomez-Perez; and (3) the cumulative total of the errors committed by the trial court amounts to reversible error. Because we hold that the trial court reversibly erred in denying Appellant's requested accomplice witness instruction, we reverse the trial court's judgment and remand this cause for a new trial.

**Facts**

Appellant was arrested and charged with two counts of engaging in organized criminal activity, one count of murder, and one count of aggravated assault with a deadly weapon. The testimony at trial showed that on May 6, 2006, Aryan Circle members Robert Byrd, Shawn Goodrich, Johnny Freeman, and Appellant met with fellow Aryan Circle member James Newell and his mother, Ruth Adkins, at a Diamond Shamrock convenience store. Atkins complained to them that her daughter, Jennifer Newell, had begun shooting methamphetamine with James Padgett, Jennifer's boyfriend, and that he was

2

"spinning [her] out." "Spinning out" refers to being high on methamphetamine to the point of unconsciousness.

Byrd, Goodrich, Freeman, and Appellant then drove to Padgett's home in Granbury, Texas. The truck they were driving belonged to one of Byrd's friends, Jennifer Gomez-Perez, who was riding with them. Padgett was not at home, but the group encountered him in his truck as they left his subdivision. The four men got out of the truck; Appellant and Byrd were armed with knives. Both men's knives had black blades and handles, but Appellant's knife also had holes in the handle. Freeman punched Padgett in the mouth, and both Appellant and Byrd stabbed Padgett.

The men then got back in the truck, and as they drove away, Appellant used beer to clean off his knife, which he then threw out of the truck somewhere behind the front gate of the subdivision. Appellant complained that his knife had been "too dull to do anything," but Byrd stated that he "got [Padgett] good enough."

Padgett was taken to the hospital after he was found by people driving through the area. Relying on a tip from Goodrich, a sheriff's deputy subsequently found a knife that Goodrich identified as Appellant's. Padgett suffered from multiple complications from his injuries and died about a year after the attack.

3

Appellant was indicted on four charges and brought to trial. The jury was ultimately charged on two of the offenses for which Appellant had been indicted: engaging in criminal activity (count three) and aggravated assault with a deadly weapon (count four). The jury found him guilty on both counts.

## Accomplice Witness Instruction Required

Appellant requested a jury instruction regarding the testimony of Jennifer Gomez-Perez, asking that the jury be instructed to determine whether she was an accomplice as a matter of fact; the trial court denied his request. In his second issue, Appellant complains of this denial. The code of criminal procedure provides, "A conviction cannot be had upon the testimony of an accomplice unless corroborated by other evidence tending to connect the defendant with the offense committed; and the corroboration is not sufficient if it merely shows the commission of the offense."[2] A witness may be an accomplice either as a matter of law or as a matter of fact.[3] Unless the evidence clearly shows that the witness is an accomplice as a matter of law, in that the witness has been or could have been indicted with the same offense, the question of whether the witness is an accomplice is properly left to the jury

---

[2] Tex. Code Crim. Proc. Ann. art. 38.14 (Vernon 2005).

[3] *Cocke v. State*, 201 S.W.3d 744, 747 (Tex. Crim. App. 2006), *cert. denied*, 549 U.S. 1287 (2007).

4

as an issue of fact.[4]  The instruction in that case must define the term "accomplice" and instruct the jury that, if the jury determines that the witness is an accomplice as a matter of fact, the jury may not convict on the accomplice testimony unless the testimony is corroborated by other evidence tending to connect the defendant with the offense committed, and that the corroboration is not sufficient if it merely shows the commission of the offense.[5]

In determining whether a person is an accomplice, courts may look to events before, during, and after commission of the offense, including actions that show an understanding and common design to do a certain act.[6] To be an accomplice witness, there must be some affirmative act on the witness's part to assist in the commission of the offense.[7]  A witness is not deemed an accomplice because he knew of the crime but failed to disclose it or even

---

[4] *Id.* at 747–48.

[5] *Id.* at 747; *see also* Tex. Code Crim. Proc. Ann. art. 38.14.

[6] *See Kunkle v. State*, 771 S.W.2d 435, 439 (Tex. Crim. App. 1986), *cert. denied*, 492 U.S. 925 (1989).

[7] *Kutzner v. State*, 994 S.W.2d 180, 187 (Tex. Crim. App. 1999).

concealed it.[8]  Likewise, mere presence at the scene or acting as accessory after the fact is not sufficient to make a witness an accomplice.[9]

The record shows the following.  Gomez-Perez lived with Robert Byrd. She owned the Dodge truck used to transport the group to and from the crime scene.  Gomez-Perez, Appellant, Goodrich, and Byrd drove to Freeman's house in Granbury to pick him up.  They then went to a convenience store.  Freeman and Byrd got out of the truck to go talk to James Newell and his mother in the parking lot.  They talked for a few minutes and then got back into the truck. The group then drove to James Padgett's house.  They discussed killing a person in general as they drove around.  Although Gomez-Perez claimed that Freeman drove, not she, and that she had ridden along only because she was concerned about the welfare of her truck, she admitted that she had heard the men talking about going to find James Padgett.  She also admitted that she knew Robert Byrd and Appellant were members of an Aryan gang and that she had met them through her involvement with drugs.

---

[8] *Blake v. State*, 971 S.W.2d 451, 454 (Tex. Crim. App. 1998); *Harris v. State*, 738 S.W.2d 207, 215–16 (Tex. Crim. App. 1986), *cert. denied*, 484 U.S. 872 (1987); *Russell v. State*, 598 S.W.2d 238, 249 (Tex. Crim. App.), *cert. denied*, 449 U.S. 1003 (1980).

[9] *Blake*, 971 S.W.2d at 454; *Harris*, 738 S.W.2d at 215–16.

When Gomez-Perez, Appellant, and the others arrived at Padgett's house, a female was standing on the porch. Byrd asked if Padgett was there, and she said that he was not. The driver turned the truck around to leave. As they were leaving the subdivision, they saw Padgett coming in. As they passed Padgett, according to Gomez-Perez's testimony, Freeman turned the truck around and pulled in front of Padgett. Gomez-Perez testified that Appellant, Freeman, and Byrd got out of the truck and that Appellant and Byrd were carrying knives. They took the knives with them as they walked behind Gomez-Perez's truck. Gomez-Perez made no attempt to drive her truck away from the scene but instead stayed inside, waiting. She testified that she was not curious about what the men were going to do with their knives.

When they came back to the truck, the men were breathing heavily and were still carrying their knives; their clothes had blood on them. As they drove off in the pickup, Byrd threw the knives out of the truck after "[t]hey were wiped off." Gomez-Perez claimed that Freeman was still driving. They drove down country roads until they ended up at a Wal-Mart. Although Gomez-Perez claimed to be afraid of the men, she went into the Wal-Mart store with them to buy clothes to replace their bloody clothing, she paid for their new clothes, and she stayed with them as they drove to Desoto. She rented a room for all of them, and they all went into the room. Byrd and Freeman took her phone

7

and her keys to her truck and left. She stayed in the room with Appellant and Goodrich.

Goodrich, who admitted that he was with the group on the day they stabbed Padgett, testified that he stayed in the truck with Gomez-Perez while the others got out to talk to James Newell and his mother at the convenience store. Goodrich testified that when they pulled over in front of Padgett, he thought there was just going to be a fight. But he also admitted that beforehand, while riding in the pickup, he heard Byrd talking about killing someone. Again, this conversation occurred during the pickup truck ride before the attack occurred. Goodrich said that Byrd was trying to pump up Appellant to see if he had "ever done that before" and to see if Appellant would be able to stab Padgett. The men got out of the truck carrying their knives. Goodrich saw the attack begin, and he heard it finish. He testified that when Appellant got back in the truck, Appellant said that his knife was too dull to do anything. Goodrich testified that, in his opinion, based on what he saw that day and based on what he knew about the men in the Aryan Circle gang, the stabbing of James Padgett was done "in furtherance of the gang."

Gomez-Perez claimed that she was sitting in the back seat the entire day of the attack. But there is also some evidence that she was in the front seat. Jennifer Newell testified that when Appellant came by looking for Padgett at

8

the house she shared with Padgett, she saw Gomez-Perez seated in the front seat of the pickup beside the driver.

James Lanningham saw the men running from the scene of the stabbing to Gomez-Perez's truck. Lanningham testified that he saw the men who had stabbed Padgett notice him, and then they turned around and fled. They ran toward Gomez-Perez's truck, and he watched them jump into it. He did not remember whether the truck doors were open. He did not remember seeing anybody get in via the driver's door. They got in through the rear driver's side door and the front and back passenger side doors. He testified that that fact led him to believe that someone he had not seen was behind the wheel.

Gomez-Perez testified that Freeman had been driving before he got out of the truck to attack Padgett, and Jennifer Newell testified that Gomez-Perez was sitting beside the driver. If, as Lanningham suggested, neither Freeman nor any other man got into the driver's seat after the assault, that is some evidence that Gomez-Perez was the getaway driver. In contrast to *Lane v. State*,[10] this is not a case of "mere presence."

Considering the evidence as a whole—

* the truck belonged to Gomez-Perez,

---

[10] 991 S.W.2d 904, 907 (Tex. App.—Fort Worth 1999, pet. ref'd).

9

- she knew the men were members of the Aryan Circle,

- she went with them in her truck to the Diamond Shamrock,

- she saw them talking to James Newell and his mother (although there is no evidence that she heard what they discussed),

- in the truck, the group discussed killing a person, asking whether Appellant was up to it and trying to pump him up,

- Gomez-Perez accompanied the men to Padgett's house, looking for him and asking about his whereabouts,

- they pulled over Padgett's truck, she waited in her truck while the men got out with knives and stabbed Padgett, and she may have been the getaway driver, and

- although their clothes were bloody when they got back in the truck, and they wiped off their knives and threw them out of the truck, she nevertheless went with them to Wal-Mart and bought them new clothes, and then to DeSoto where she rented them a motel room, and then she gave her keys to Freeman so he and Byrd could drive her truck away—

we hold that there is some indication that Gomez-Perez acted as an accomplice by providing the truck and the gasoline, accompanying the attackers, staying in the truck as a lookout would, keeping the truck at the crime scene to be available for the attackers to escape, and then acting as the getaway driver. This evidence is more than sufficient to permit the jury to conclude as a matter of fact that Gomez-Perez was an accomplice. The trial court, therefore, erred in refusing to submit an instruction on accomplice as a matter of fact.

10

**Appellant Suffered Some Harm**

Next, under *Almanza*, we must determine whether Appellant suffered any harm.[11] There was no physical evidence connecting Appellant to the offense. Although there is evidence from various witnesses concerning his participation, all of the witnesses who testified concerning the acts they viewed at or near the time of the offense were accomplice witnesses, except for Jennifer Newell and Lanningham. Lanningham could not identify Appellant as one of the men he saw running to the truck. Jennifer Newell testified that she saw Appellant in the truck, but there was also evidence that she had a very serious drug problem and fell off the porch when she came outside in response to Gomez-Perez's truck's approach. Jennifer Newell's testimony conflicted with Gomez-Perez's testimony concerning where Gomez-Perez was sitting in the truck. It is unclear whether the jury found Jennifer Newell a credible witness.

The only evidence connecting Appellant to the offense itself was the testimony of the accomplices, including Gomez-Perez. Applying the appropriate test, we therefore hold that Appellant suffered some harm as a result of the trial court's error in refusing to instruct the jury to consider whether

---

[11] *See Herron v. State*, 86 S.W.3d 621, 632 (Tex. Crim. App. 2002).

Gomez-Perez was an accomplice as a matter of fact.  We sustain his second issue.

## Conclusion

Because his second issue is dispositive, we do not address Appellant's remaining issues,[12] except to note, in the interest of judicial economy, that he is entitled to the previous testimony of the witnesses for purposes of cross-examination.[13]  Having sustained Appellant's second issue, we reverse the trial court's judgment and remand this cause for a new trial.

LEE ANN DAUPHINOT
JUSTICE

PANEL:  DAUPHINOT, GARDNER, and MEIER, JJ.

DO NOT PUBLISH
Tex. R. App. P. 47.2(b)

DELIVERED:  February 26, 2009

---

[12] *See* Tex. R. App. P. 47.1.

[13] See Tex. R. Evid. 615; *Enos v. State*, 889 S.W.2d 303, 305 (Tex. Crim. App. 1994) (explaining the *Gaskin* rule).

12